Judge STUCKY
delivered the opinion of the Court.
We granted review in this case to determine whether the military judge provided complete and accurate self-defense instructions, and whether the Government failed to disclose favorable and material information to Appellant’s prejudice. We hold that, although the military judge’s instruction on escalation was erroneous, it was harmless beyond a reasonable doubt because escalation was not in issue. Moreover, contrary to Appellant’s arguments, withdrawal also was not in issue. We further hold that, even assuming that the information Appellant asserts the Government failed to disclose was favorable, it was immaterial in regard to findings and sentencing because the evidence substantially overlapped with other evidence presented by other defense experts, Appellant was not entitled to an escalation instruction, and the members clearly rejected the Government’s theory of premeditated murder. We, therefore, affirm the judgment of the United States Army Court of Criminal Appeals (CCA).
I.
A.
Contrary to Appellant’s pleas, a general court-martial with members found Appellant guilty of unpremeditated murder and assault in violation of Articles 118 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918, 928 (2006). Appellant was sentenced to a dismissal, twenty-five years of confinement, and forfeiture of all pay and allowances. The convening authority reduced the *230 amount of confinement to twenty years but otherwise approved the sentence as adjudged. The CCA affirmed the findings of guilty and the sentence as approved by the convening authority. United States v. Behenna, 70 M.J. 521, 534 (A.Ct.Crim.App. 2011).
B.
In September 2007, Appellant was assigned to Bayji, Iraq, an area north of Baghdad. His platoon’s area of operation was Albu Toma. During his deployment, Appellant learned of information linking Ali Man-sur, the deceased in this case, to a group in Albu Toma, who were believed to be responsible for attacks on Coalition Forces. Appellant also learned from human intelligence reports that Mansur would stand on the police station west of Albu Toma overlooking Salaam Village and inform insurgents of Coalition Forces’ activities.
Before April 21, 2008, Appellant had given out his cell phone number to locals so that they could contact him with issues. Someone named Ali called Appellant and warned him to avoid Albu Toma or else harm would come to his platoon. Appellant also learned from a source that Mansur had spoken of an improvised explosive device being planted along a roadway used by Appellant’s platoon.
On April 21, Appellant’s platoon was patrolling Salaam Village and detained two individuals. On the return trip to base, an explosive device was detonated near the vehicles. Appellant saw several individuals in his platoon injured or killed by the blast. A draft intelligence information report issued on April 27 stated that Mansur was likely a member of the group that was operating out of Salaam Village. After the report was issued, Mansur was apprehended for interrogation, but shortly after questioning was finished, Mansur was to be returned to Albu Toma.
Appellant read the report of Mansur’s interrogation and only found information regarding Mansur’s job and background and his relation to an RPK.[1] Appellant asked that Mansur be reinterrogated based on his belief that Mansur had information on insurgents operating out of Salaam Village, who Appellant believed were responsible for the April 21 attack. Appellant did not participate in the second interrogation, and although Mansur provided information willingly, the interrogator told Appellant that Mansur was being deceptive.
After the second interrogation, Appellant was ordered to return Mansur to Albu Toma. Appellant continued to believe that Mansur had information regarding the April 21 attack and the group operating out of Salaam Village; he further believed those questions had not been asked and answered. On the day that Mansur was to be released, Appellant went with an interpreter, Mr. Tarik Abdallah Silah (referred to by the parties as Harry), to retrieve Mansur from his cell. Appellant told Mansur, “I’m going to talk to you later on today. There is [sic] three pieces of information that I want from you .... If I don’t get that information today, you will die today.” Appellant admitted the scare tactic was unauthorized but claimed his intent was only to frighten Mansur into providing information.
Appellant’s platoon returned a different detainee before passing through Albu Toma without releasing Mansur. Appellant ordered his platoon to take the desert route back to base, because he wanted “to talk to Ali in a remote, secure location.” On the desert route, Appellant saw a culvert; he ordered the platoon to stop, because he believed this was an appropriate location to speak with Mansur. Appellant told Harry to follow him as Appellant retrieved Mansur from Sergeant Warner’s truck. Appellant asked Warner if he had a thermite grenade. Warner did not at that time, and Appellant did not order him to find one.
Appellant, Harry, and Mansur immediately started walking towards the culvert. In the *231 meantime, Warner found a thermite grenade and caught up with the group at the culvert. Upon reaching the culvert, Appellant saw there was a second culvert and led the group there. Outside the second culvert, Appellant told Mansur he wanted the information he had asked about earlier that day. Mansur responded that he did not know anything.
Appellant then moved Mansur into the culvert and cut off his shirt and told Warner to cut off his pants and underwear. Appellant then attempted to remove the zip ties that bound Mansur’s hands, but Harry eventually had to remove them for Appellant. Appellant ordered Mansur, who was then naked and unbound, to sit on a rock or piece of concrete inside the culvert. Mansur continued to claim ignorance, so Appellant pointed a loaded pistol at him to frighten him into providing the information.
C.
By this time, it was dark and dusty outside, visibility was low, and Warner was using night vision goggles. As soon as Appellant pulled out his pistol, Harry stepped outside the culvert because he was afraid of the ricochet. Harry testified that from his vantage point he could make out the figure of a person but could not distinguish Man-sur’s arms and hands. Once Harry was outside the culvert, Appellant again asked for the information and stated that if Man-sur did not tell him what he wanted to hear that he would die. Mansur said something, and Harry looked at Appellant to translate, and then two shots were fired. Harry testified that everything happened quickly, that he was surprised by the gunshots, and that he did not see exactly what happened before the shots were fired. He did not know what happened to cause Appellant to shoot Mansur.
Warner was approximately thirty-five to fifty meters away when he heard the first pistol shot. From his original angle, Warner could not see inside the culvert; so, he moved to a better position. He saw the muzzle flash from the second shot. Warner ultimately identified Appellant as the individual who fired the pistol shots that killed Mansur. When Warner reached the culvert, Appellant told him to “[t]hrow it.” Warner asked, “[t]hrow what” and Appellant said “[d]on’t be stupid.” Warner tossed the ther-mite grenade in the direction of Mr. Man-sur’s body. Appellant then told Warner to take care of the clothes.[2]
Appellant’s testimony was mostly consistent with that of the other witnesses, although he did elaborate on what occurred before he fired his pistol. He testified that he pointed his pistol at Mr. Mansur and told him that “[t]his [was his] last chance to tell the information or [he would] die.” Appellant testified he heard Mr. Mansur say something in Arabic that was different than his previous responses, so he looked over to Harry for interpretation.
While looking at Harry, Appellant testified that he heard a piece of concrete hit over his left shoulder. He turned towards Mansur and saw him reaching for the pistol; the distance between them was only two or three feet. He took a step or two to his left, towards the entrance of the culvert, to create distance between him and Mansur, and then fired two shots into Mansur. Mansur was shot once in the head and once in the chest; the order of the shots was a contested issue. Behenna, 70 M.J. at 524. Appellant stated that everything happened fast and that he fired the shots because he “was scared [Man-sur] was going to take [his] weapon.” Appellant insisted throughout his testimony that he never intended to kill Mansur; he just wanted to scare him for information.
Upon returning to base, Appellant took Warner on a walk and asked him if he was “cool.” Warner indicated he was. Harry later asked Appellant why he had shot Man-sur, and Harry testified that Appellant said “‘Ali Mansur planted explosives twice on a specific road and the explosive that went off *232 in the Salaam Village, he had a hand into this too. He was part of this operation.’ ”
D.
During trial, the defense provided unrebut-ted testimony from two experts in the field of forensics. Dr. Radelat, a medical doctor, testified that in his expert opinion that Man-sur was standing when he was shot. He testified that Mansur’s chest wound had entered under his right arm between the fourth and fifth rib in a horizontal path indicating that the pistol was level with Mansur’s wound and that Mansur’s right arm was not in the flight path of the bullet.
Dr. Radelat theorized that the chest wound was inflicted first, because the photographs appeared to show Mansur clutching a chest wound with blood running over his hand. He bolstered this analysis by noting that the head wound would have been so devastating that, had it been inflicted first, Mansur would not have been capable of reacting to the chest wound. Dr. Radelat admitted that the horizontal wound could have been caused if Mansur had been falling at the same angle the gun was pointed, although he suggested this scenario defied reason.
The defense also called Mr. Bevel, an expert in scene reconstruction. Mr. Bevel theorized that the chest wound was inflicted first and that Mansur was standing when shot. He concluded that Mansur was standing when shot because of the level trajectory of the wound. He also bolstered that opinion based on the fact that it appeared Mansur had clutched the chest wound and the manner in which the blood ran over Mansur’s hand. He acknowledged that given the wound’s location on Mansur’s chest that his right arm had to be out of the flight path of the bullet, which, at the very least, meant his arm was not hanging straight down.
He noted that the head wound also had a horizontal trajectory, which could be consistent with Mansur standing, so long as the second shot was fired as Mansur slumped towards the ground. Mr. Bevel also testified that the nature of the blood trail indicated that Mansur likely was not falling backwards. Under Government cross-examination, Mr. Bevel admitted that other scenarios could reasonably explain the horizontal wound trajectories to the chest and head and how Mansur’s right arm avoided the flight pattern of the bullet. Facts necessary to resolve the alleged violation under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), are included below.
II.
The first issue is whether the members were improperly instructed about how Appellant could lose and regain the right to act in self-defense. Although we find the instruction on escalation was erroneous, the error was harmless beyond a reasonable doubt. Appellant was not entitled to such an instruction at all, as there was no evidence raising the issue of escalation. Moreover, contrary to Appellant’s arguments, withdrawal was not in issue either, for the same reason.
A.
An allegation that the members were improperly instructed is an issue we review de novo. United States v. Ober, 66 M.J. 393, 405 (C.A.A.F.2008). In regard to form, a military judge has wide discretion in choosing the instructions to give but has a duty to provide an accurate, complete, and intelligible statement of the law. See United States v. Wolford, 62 M.J. 418, 419 (C.A.A.F. 2006) (recognizing that instructions must be correct and complete); see also United States v. Medina, 69 M.J. 462, 465 (C.A.A.F. 2011) (noting that an instruction must be clear and correct). In reviewing the propriety of an instruction, appellate courts must read each instruction in the context of the entire charge and determine whether the instruction completed its purpose. See Jones v. United States, 527 U.S. 373, 391, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).
In regard to substance, the instructional issues in this case involve self-defense. The standard for self-defense is set out in Rule for Court-Martial (R.C.M.) 916(e)(1), which provides that if an individual apprehends on reasonable grounds that grievous bodily harm or death is about to be wrongfully *233 inflicted to his or her person, then the individual may use such force as is appropriate for the circumstances, including deadly force. See United States v. Lewis, 65 M.J. 85, 88 (C.A.A.F.2007) (recognizing that R.C.M. 916 generally restates the well-settled law of self-defense).
The right to act in self-defense, however, is not absolute. Initial aggressors and those involved in mutual combat lose the right to act in self-defense. See R.C.M. 916(e)(4). However, an initial aggressor or a mutual combatant regains the right to act in self-defense if the other party escalates the degree of force, or if the initial aggressor or the mutual combatant withdraws in good faith and communicates that intent to withdraw. See Lewis, 65 M.J. at 88; R.C.M. 916(e)(4). With these principles in mind, we turn our attention to the instructions in this case.
B.
The military judge provided a facially correct instruction on self-defense.[3] Appellant’s claim of error is in regard to the following instruction on losing and regaining the right to act in self-defense:
Now there exists evidence in this case that the accused may have been assaulting Ali Mansur immediately prior to the shooting by pointing a loaded weapon at him. A person who without provocation or other legal justification or excuse assaults another person is not entitled to self-defense unless the person being assaulted escalates the level of force beyond that which was originally used. The burden of proof on this issue is on the prosecution. If you are convinced beyond a reasonable doubt that the accused, without provocation or other legal justification or excuse, assaulted Ali Mansur then you have found that the accused gave up the right to self-defense. However, if you have a reasonable doubt that the accused assaulted Ali Mansur, was provoked by Ali Mansur, or had some other legal justification or excuse, and you are not convinced beyond a reasonable doubt that Ali Mansur did not escalate the level of force, then you must conclude that the accused had the right to self-defense, and then you must determine if the accused actually did act in self-defense.
Emphasis added.
This instruction is erroneous for two reasons. First, the military judge provided no guidance on how to evaluate an offer-type assault, which occurs, for instance, when an individual points a loaded pistol at another person without lawful justification or authorization. We recognize that the military judge had previously instructed the members on an assault consummated by a battery, but those instructions did not include guidance on how to evaluate the offer-type assault that preceded the killing of Mansur. See Manual for Courts-Martial, United States (MCM) pt. IV, ¶ 54.c.(1)(b) (2012 ed.). Thus, the members were never instructed that for Appellant to have assaulted Mansur by pointing the pistol at him, Mansur had to reasonably ap *234 prehend immediate bodily harm. See MCM pt. IV, ¶ 54.c.(1)(b)(ii). The two varieties of assault are sufficiently different that, even when the instructions are viewed holistically, the first portion of the instruction was incomplete. See United States v. Marbury, 56 M.J. 12, 17 (C.A.A.F.2001) (holding the critical issue in offer-type assaults is whether the victim reasonably apprehended imminent bodily harm as compared to assaults consummated by a battery in which the critical issue is actual bodily harm).
More importantly, the second emphasized portion of the instruction is an erroneous statement of law. Specifically, the military judge linked the lawful use of force with the issue of escalation with the conjunction “and.” (“Howevei’, if you have a reasonable doubt that the accused assaulted Ali Mansur, was provoked by Ali Mansur, or had some other legal justification or excuse, and you are not convinced beyond a reasonable doubt that Ali Mansur did not escalate the level of force, then you must conclude that the accused had the right to self-defense.... ” (emphasis added)). This is an inaccurate statement of law because Appellant would have had the right to self-defense if his original use of force had been lawful—it was provoked, justified, or otherwise excusable (i.e., Appellant was not an initial aggressor)—or if Mr. Mansur had escalated the level of force. See Lewis, 65 M.J. at 88-89; R.C.M. 916(e)(1), (4). Having found that the instruction was erroneous, we must test for prejudice.
C.
When instructional errors have constitutional implications, as instructions involving self-defense do, then the error is tested for prejudice under a “harmless beyond a reasonable doubt” standard. Lewis, 65 M.J. at 87 (citation and quotation marks omitted). Only when the reviewing authority is convinced beyond a reasonable doubt that the error did not contribute to the defendant’s conviction or sentence is a constitutional error harmless. Id. (citations omitted).
Generally, a superfluous, exculpatory instruction that does not shift the burden of proof is harmless, even if the instruction is otherwise erroneous. See United States v. Thomas, 34 F.3d 44, 48 (2d Cir.1994) (providing a potentially erroneous self-defense instruction could not have been prejudicial to the defendants because “their need to defend themselves arose out of their own armed aggression”); Melchior v. Jago, 723 F.2d 486, 493 (6th Cir.1983) (even if instruction was erroneous it was harmless beyond a reasonable doubt where “there was insufficient evidence to submit the issue of self-defense to the jury in the first instance”).
As discussed further below, Appellant lost the right to act in self-defense as a matter of law; therefore, any instruction on losing and regaining the right to self-defense was superfluous. Our case law makes clear that a military judge is only required to instruct when there is some evidence in the record, without regard to credibility, that the members could rely upon if they choose. United States v. Schumacher, 70 M.J. 387, 389 (C.A.A.F.2011) (citing Lewis, 65 M.J. at 87). In other words, a military judge must instruct on a defense when, viewing the evidence in the light most favorable to the defense, a rational member could have found in the favor of the accused in regard to that defense. See id. (quoting Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)). This is a legal question that is reviewed de novo. See id. at 389-90.
D.
We begin by noting that Appellant was not in an active battlefield situation, that Mansur was not then actively engaged in hostile action against the United States or its allies, and that there were no other military exigencies in play. Appellant’s counsel at oral argument conceded that Appellant was not seeking a special privilege based on Appellant’s status as a soldier or presence on the battlefield. After careful consideration, we agree that the events that transpired in the culvert do not implicate the unique aspects of military service in a manner that requires us to apply other than basic criminal law concepts. Thus, we evaluate this sitúa *235 tion by applying the fundamental concepts of self-defense as imbedded in this Court’s case law and the MCM.
As discussed earlier, if Appellant was the initial aggressor- — i.e., the one that provoked or brought about the situation that resulted in the necessity to kill another[4] — then he lost his right to self-defense, unless the deceased, Mansur, either escalated the level of force or Appellant withdrew and communicated that withdrawal in good faith. See Lewis, 65 M.J. at 88-89; R.C.M. 916(e)(1), (4).
Even when viewed in the most favorable light, Appellant’s own testimony about the events that transpired in the culvert demonstrate that he was the initial aggressor because he brought about the situation that resulted in his killing of Mansur. Appellant deviated from his assigned duty to return Mansur to his home, without authority, to take him to a remote culvert in the desert, far from any active hostilities for further unauthorized interrogation.
More importantly, Appellant then stripped the detainee naked and forced him to sit on a rock while Appellant, in full combat attire with a loaded pistol, interrogated him. Appellant also told Mansur, as he had on other occasions that day, that he was going to die unless he provided specific information. Cf. MCM pt. IV, ¶ 54.e.(1)(c)(iii) (“Thus, if Doe points a pistol at Roe and says, ‘If you don’t hand over your watch, I will shoot you.’ Doe has committed an assault upon Roe.”).
Although we are mindful that Mansur was a detainee, it is evident that Appellant’s use of force in the culvert before the shooting— the critical moment in reviewing this issue— was unauthorized and excessive.[5] Cf. United States v. Archer, 486 F.2d 670, 676-77 (2d Cir.1973) (“It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums.”). Even accepting the facts as Appellant described them on direct examination, there is no evidence on which a rational member could rely to conclude that Appellant was not the initial aggressor. The next question is whether a rational member could have found that Appellant regained the right to act in self-defense as a result of either Mansur’s escalating the conflict or Appellant’s withdrawing in good faith.
Under our ease law, Mansur could not have escalated the level of force in this situation,[6] as Appellant had already introduced deadly force. See United States v. Stanley, 71 M.J. 60, 63 (C.A.A.F.2012); see also Armstrong v. Bertrand, 336 F.3d 620, 623, 625-26 (7th Cir.2003) (holding that an armed gunman did not regain the right to self-defense even though the victim threatened to kill the gunman and lunged for his gun); Wayne R. LaFave, Substantive Criminal Law § 10.4(e) (2d ed. 2003) (noting that a nondeadly aggressor is one who uses “only his fists or some nondeadly weapon”). Even assuming for a moment that Mansur could have escalated the level of force, we conclude that a naked and unarmed individual in the desert does not escalate the level of force when he throws a piece of concrete at an initial aggressor in full battle attire, armed with a *236 loaded pistol, and lunges for the pistol. See Armstrong, 336 F.3d at 623, 625-26. This is especially so when the initial aggressor “had every opportunity to withdraw from the confrontation and there was no evidence he either attempted or was unable to do so.” See Behenna, 70 M.J. at 532-33; see also R.C.M. 916(e)(4) Discussion (“Failure to retreat ... does not deprive the accused of the right to self-defense[, but] [t]he availability of avenues of retreat is one factor which may be considered in addressing ... that the force used was necessary for self-protection”).
Furthermore, nothing in Appellant’s testimony indicated that he clearly manifested an intent to withdraw or that Mr. Mansur prevented Appellant from withdrawing. See United States v. O’Neal, 16 C.M.A. 33, 37, 36 C.M.R. 189, 193 (1966) (“His testimony contains no suggestion of a word or act that could reasonably be interpreted by the others as indicating he wanted to end the fight”). As the CCA found, there was no evidence that Mansur made contact with Appellant’s weapon, that Appellant indicated a desire to withdraw, or that Appellant made a good-faith effort to withdraw. Behenna, 70 M.J. at 532-33. Rather, Appellant took one or two steps towards the entrance of the culvert where the vast desert, Warner, and the rest of his platoon were waiting, before he shot Mansur twice. See id. at 523. Even accepting the facts as Appellant described them on direct examination, no rational member could have found either that Mansur escalated the situation or that Appellant withdrew in good faith.
Contrary to the dissent’s suggestion, we have not decided any factual matters that should have been before the members. There is no factual issue for the members to resolve until “there is some evidence upon which members could reasonably rely [upon] to find that each element of the defense has been established.” Schumacher, 70 M.J. at 389-90. Importantly, the issue in this case is not whether there was some evidence of self-defense. Rather, our holding is that any evidence of self-defense was overcome by other events, namely the unrebutted evidence that Appellant was an initial aggressor and the dearth of evidence of escalation by Mansur or good faith withdrawal by Appellant — matters thoroughly discussed above.[7]
Ultimately, even if we assume that Mansur lunged for Appellant’s pistol and Appellant feared that Mansur would use the pistol if he was able to seize it, because Appellant was the initial aggressor, and because there was no evidence to support a finding of escalation or withdrawal, a rational member could have come to no other conclusion than that Appellant lost the right to act in self-defense and did not regain it.[8] See Branch, 91 F.3d at 712 (“The district court is not required to put the case to the jury on a basis that essentially indulges and even encourages speculations.” (quotation marks and citation omitted)). As such, withdrawal was not in issue and the erroneous instruction on escalation was superfluous. As we noted earlier, superfluous, exculpatory instructions that do not impermissibly shift burdens are generally harmless beyond a reasonable doubt, even if the instructions are otherwise erroneous. Nothing in these facts suggests that we should deviate from that conclusion. For this reason, Appellant is not entitled to relief.
III.
The second issue is whether the Government failed to disclose favorable information to Appellant’s detriment in violation of Brady. Even if we assume error in this regard, *237 the error was harmless beyond a reasonable doubt both in regard to findings and sentence.
A.
The Government received a discovery request from defense counsel on August 28, 2008, requesting that the Government provide defense counsel with all exculpatory evidence. The Government gave notice that it had retained Dr. Herbert MacDonell as an expert consultant, whose opinion up to trial was favorable for the Government. The Government ultimately rested its case without calling Dr. MacDonell. On Wednesday, February 25, 2009, defense put on the testimony of Dr. Radelat and Mr. Bevel. During cross-examination by trial counsel, both defense experts admitted that alternative explanations existed for the forensic evidence.
Dr. MacDonell, with the consent of the parties, sat in the gallery while the other experts testified. On Wednesday night, after court was recessed and after the defense experts had testified, Dr. MacDonell, in the presence of all three Government trial counsel, demonstrated a scenario:
I asked if he [the aid to the demonstration] could stand in front of me and I put a finger in his ribs and said “Bang, now drop.” And he went down to his knees and as he went by the finger I said, “Bang.” I said, “Now that seems to me to be the only logical thing.” I admit it is extremely unlikely, but sometimes things that happen that are statistically improbable do happen [sic].
Dr. MacDonell also testified that he ended his discussions with trial counsel by stating that “anything is possible,” because “[y]ou can’t be certain of a theory like that. A scenario can be presented, but if it is consistent with the facts it can be believed, but it may not be the only explanation.”
On Thursday, Dr. MacDonell heard Appellant’s testimony, which was consistent with the theory he presented Wednesday. This caused Dr. MacDonell to believe that Appellant was telling the truth. During the post-trial Article 39(a), Brady hearing, Dr. Mac-Donell testified that after hearing Appellant’s testimony he only spoke with another Government witness about how Appellant’s description of events was exactly how he had theorized it might have occurred. In an affidavit submitted after the Article 39(a) session, however, Dr. MacDonell averred that he also told the prosecutors on Thursday that “although the scenario I had presented to them the day before [Wednesday] was unlikely, it still was the only theory I could develop that was consistent with the physical evidence. It was also exactly the way Lt. Behenna had described the events.”
Regardless of the discrepancy, as Dr. Mac-Donell left for his return flight on Thursday, he told defense counsel he would have been a great witness for them. When asked to elaborate, Dr. MacDonell said he thought it would have been inappropriate to explain further given his relation to the Government in this case. In light of Dr. MacDonell’s odd statement on Thursday, defense counsel asked the prosecutors before trial began on Friday morning if it was in possession of any exculpatory information. The prosecutors stated that they were unaware of any exculpatory information. Later that day, the members returned a finding of guilty to assault and unpremeditated murder.
At approximately 4 p.m. on Friday, Dr. MacDonell sent an e-mail to the prosecutors, in which he stated that “I feel that [my opinion] is quite important as possible exculpatory evidence so I hope that, in the interest of justice, you informed [defense counsel] of my findings. It certainly appears like Brady material to me.” One of the prosecutors discovered the e-mail late Friday night and forwarded the e-mail to defense counsel with a note that stated “I am not sure that I believe that Mr. MacDonell’s new opinion is exculpatory, but I wanted to send it to you in an abundance of caution.” Defense counsel moved for a mistrial on the basis of a Brady violation.
B.
Pursuant to Brady, the Government violates an accused’s “right to due process if it withholds evidence that is favorable to the defense and material to the defen *238 dant’s guilt or punishment.” Smith v. Cain, — U.S. —, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012). Evidence is favorable if it is exculpatory, substantive evidence or evidence capable of impeaching the government’s case. United States v. Orena, 145 F.3d 551, 557 (2d Cir.1998) (citing United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Evidence is material when “there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.” Smith, 132 S.Ct. at 630. To be material, the evidence must have made the “likelihood of a different result ... great enough to ‘undermine[] confidence in the outcome of the trial.’ ” Id. (alteration in original) (citation omitted). Once a Brady violation is established, courts need not test for harmlessness. Kyles v. Whitley, 514 U.S. 419, 435-36, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).[9]
C.
We do not need to determine who learned of what information when. Even if we assume the evidence was favorable and not properly disclosed, the evidence was ultimately immaterial both as substantive and impeachment evidence. Dr. MacDonell’s testimony, at most, would have made Appellant’s version of events more likely, that is, that Appellant shot Mansur as he stood and reached for Appellant’s pistol. In turn, whether Mansur remained seated or stood when he was shot was only relevant to two issues: premeditation and self-defense.
The result in this ease — Appellant was convicted of unpremeditated murder — negates any argument that this evidence could have affected the outcome on the issue of premeditation, as the members clearly rejected the Government’s theory of the case — a premedi-fated, execution-style killing — when they returned a verdict that Appellant was guilty of unpremeditated murder. In regard to self-defense, Dr. MacDonell’s testimony could not have independently established the factual predicate for a self-defense theory; rather, it would have only bolstered Appellant’s version of events. Assuming the truth of Appellant’s version of what transpired in the culvert, he had lost the right to act in self-defense as a matter of law. See supra Part II.D.
Moreover, Dr. MaeDonell’s testimony did not differ greatly from either of the defense experts’ testimony. The two defense experts essentially testified that the most logical theory was that Mansur stood as he was shot, with his right arm out of the way, as if he were reaching for something, but they agreed this was not the only theory that could explain the forensic evidence. Dr. MacDonell would have agreed that the defense theory was the most, maybe only, logical outcome, but that one “can’t be a certain of a theory like that,” because “anything is possible,” The difference between Dr. MacDonell’s opinion and the other experts’ opinions was negligible. See United States v. Gonzalez, 62 M.J. 303, 307 (C.A.A.F.2006) (noting that the overlapping nature of the evidence undercuts an argument that the failure to disclose pursuant to Brady was prejudicial); see also United States v. Agurs, 427 U.S. 97, 114, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (noting that the alleged Brady material did not contradict any evidence already admitted and was similar to other evidence in the record in holding that there was no Brady violation).
Although there may be value in a Government expert’s testimony that the defense theory is more convincing than the Govern *239 ment’s theory of the ease, it is significantly less so when, as in this case, the Government expert did not testify on behalf of the Government or recant testimony previously provided. See United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir.2011) (recognizing that the value of Brady evidence must be evaluated in light of the other evidence admitted at trial). Dr. MacDonell’s testimony ultimately would not have added much to Appellant’s case, other than the novelty that it came from a nontestifying expert witness associated with the Government’s case. Candidly, that novelty had little evidentiary value here in light of the similarity of Dr. MacDonell’s opinion with the other defense experts and the ease with which Dr. MacDonell’s opinion could have been impeached by his failure to provide a reasonably certain or consistent opinion. For these reasons, our confidence in the results of trial — both for findings and sentencing[10]- — -is not undermined by the Government’s failure to disclose Dr. MacDonell’s testimony.
IV.
The judgment of the United States Army Court of Criminal Appeals is affirmed.

. This acronym was not defined in the record, but it likely refers to a Russian light machine gun, Ruchnoy (also spelled "Ruchnoi”) Pulemyot Kalashnikova. See J.R. Potts, RPK (Ruchnoi Pu-lemyot Kalashnikova) Light Machine Gun, Military Factory (Feb. 16, 2012), http://www.military factoiy.com/smallarms/detail.asp?smallarms_id= 144.

. Appellant testified later in the trial that immediately after firing the shots he did not say anything. It is unclear from the context of the question and answer if Appellant was refuting Warner’s claim. It is clear, however, that an incendiary grenade was set off near Mansur’s body.

. The propriety of giving the initial self-defense instruction has not been challenged; it is provided here for context.
For self-defense to exist the accused must have had a reasonable apprehension that death or grievous bodily harm was about to be inflicted on himself and he must have actually believed that the force he used was necessary to prevent death or grievous bodily harm. In other words, self-defense has two parts; first the accused must have had a reasonable belief that death or grievous bodily harm was about to be inflicted upon himself. The test here is whether under the same facts and circumstances present in this case, an ordinary, prudent adult person, faced with the same situation would have believed that there were grounds to fear immediate death or serious bodily harm; second, the accused must have actually believed that the amount of force he used was required to protect against death or serious bodily harm.
To determine the accused’s actual belief as to the amount of force which was necessary you must look at it — you must look at the situation through the eyes of the accused. In addition to the circumstances known to the accused at the time, the accused age, intelligence, and mental condition are all important factors to consider in determining the accused's actual belief about the amount of force required to protect himself. As long as the accused actually believed that the amount of force he used was necessary to protect himself against death or grievous bodily harm, the fact that the accused may have used excessive force does not matter.

. See United States v. Cardwell, 15 M.J. 124, 126 (C.M.A.1983) (discussing an initial aggressor as one who starts an affray); see also United States v. Branch, 91 F.3d 699, 717 (5th Cir.1996) (citing several cases for the same proposition), rev’d on other grounds and remanded, Castillo v. United States, 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000).

. Appellant relied on a number of 42 U.S.C. § 1983 civil rights cases in his brief. These cases are generally inapplicable to the issue before us, because the protection of civil liberties of American citizens, which Mansur was not, varies greatly from the principles underlying criminal law and the justification for using deadly force. However, we note that even § 1983 cases recognize that if an officer points a weapon at an individual who poses no threat, then it is so clearly an excessive use of force that the officer is not entitled to qualified immunity. Cf. Baird v. Renbarger, 576 F.3d 340, 346-47 (7th Cir.2009) (holding an officer was not entitled to qualified immunity when he pointed his gun at individuals because the people targeted and the crime investigated did not suggest even a hint of danger).

.We are not deciding what, if any, right Mansur, a detainee of the United States Armed Forces, had to defend himself. We are determining Appellant's right to act in self-defense under well-settled criminal law concepts and in light of his actions.

. The record is devoid of any evidence that Man-sur used or had access to any means or force that could have caused Appellant's death or grievous bodily harm. Indeed, the evidence suggests just the opposite. See Behenna, 70 MJ. at 532 (noting that there is no evidence that Mansur, who was naked and unarmed, made contact with Appellant’s pistol).

. Despite giving the instruction, the military judge ultimately reached a similar conclusion in resolving the alleged Brady violation. ("In applying the law to the facts of this case, the members could come to no reasonable conclusion other than 1LT Behenna did not have the right to self-defense. Accordingly ... any evidence as to self-defense did not have, nor would any additional evidence as to self-defense have, made a difference in the Court's determinations.”).

. The Fifth Circuit, in Kyles v. Whitley, noted that Brady claims are subject to harmless error review. See 5 F.3d 806, 818 (5th Cir.1993). The Supreme Court, in reviewing that assertion, stated that ''contrary to the assumption made by the Court of Appeals, 5 F.3d at 818, once a reviewing court applying Bagley [materiality] has found constitutional error there is no need for further harmless-error review.” Kyles, 514 U.S. at 435, 115 S.Ct. 1555. This makes sense; if there is a reasonable probability that the evidence would have changed the result at trial, then, by definition, the failure to disclose cannot be harmless. There is no need to conduct a redundant test. See United States v. Meek, 44 M.J. 1, 5 n. 2 (C.A.A.F.1996) (noting that to the extent that the harmless error test is incorporated into another element of the test, then the harmless error test may be unnecessary).

. Appellant, despite knowing of Dr. MacDo-nell’s opinion prior to sentencing, did not ask for a continuance or take any steps to produce Dr. MacDonell on sentencing or otherwise make his testimony available at sentencing. This failure belongs to Appellant, not the Government. Appellant knew of the information with sufficient time to use the information on sentencing; thus, the evidence was timely disclosed in regard to sentencing. See DiSimone v. Phillips, 461 F.3d 181, 196-97 (2d Cir.2006) (recognizing that there is no bright-line rule for when a disclosure is timely; rather, the question is whether the evidence was disclosed in sufficient time for an accused to take advantage of the information, a determination necessarily dependent on the totality of the circumstances).