# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BURTON, HAGLER, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Private First Class CORNELL HURLEY JR.**
**United States Army, Appellant**

ARMY 20160122

Headquarters, Fort Campbell
Matthew A. Calarco and Christopher T. Fredrikson, Military Judges
Colonel Susan K. Arnold, Staff Judge Advocate

For Appellant: Captain Timothy G. Burroughs, JA (argued); Colonel Mary J. Bradley, JA; Major Julie L. Borchers, JA; Captain Timothy G. Burroughs, JA (on brief); Lieutenant Colonel Christopher D. Carrier, JA; Major Julie L. Borchers, JA; Captain Timothy G. Burroughs, JA (on reply brief).

For Appellee: Captain Jeremy Watford, JA (argued); Colonel Tania M. Martin, JA; Lieutenant Colonel Eric K. Stafford, JA; Major Cormac M. Smith, JA; Captain Jeremy Watford, JA (on brief).

24 May 2018

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

SCHASBERGER, Judge:

Private First Class Cornell Hurley, Jr. appeals his conviction for murder, attempted murder and aggravated assault, alleging that he acted in self-defense. We examine whether the evidence was legally and factually sufficient to prove beyond a reasonable doubt that appellant was *not* acting in self-defense when he opened fire, injuring two soldiers and killing one. Under the facts and circumstances of this case, we conclude appellant had no right of self-defense.

A panel with enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of attempted unpremeditated murder, one specification of unpremeditated murder, and two specifications of aggravated assault, in violation of Articles 80, 118, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 918, 928 (2012) [UCMJ]. The panel sentenced

appellant to a dishonorable discharge, confinement for twenty-five years, forfeiture of all pay and allowances, and a reduction to the grade of E-1. The convening authority approved the adjudged sentence and credited appellant with 398 days for pretrial confinement and unlawful pretrial punishment.

This case is before us for review pursuant to Article 66, UCMJ. Appellant raises two issues on appeal, one of which, appellant's claim of self-defense, merits discussion but no relief.[1] We have considered the matters personally asserted by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they lack merit.

## BACKGROUND

On the night of February 6, 2015, two groups of friends went to the Lodge Sports Bar in Clarksville, Tennessee. One group consisted of appellant and two co-workers, SPC QW and Private First Class (PFC) WW. The other group consisted of PFC KM and his girlfriend, SSG TH and his wife, PFC RR, and PFC DM. Though all of the soldiers were stationed at Fort Campbell, neither group knew the other.

Patrons entering the Lodge that evening underwent a security check to ensure no weapons entered the club. The Lodge also had security cameras inside and outside of the club.

As the night progressed, both groups drank, danced and listened to the music. At some point, PFC KM became angry because he believed appellant had inappropriately touched his girlfriend. His friends calmed him down. Later that night, PFC KM again saw appellant walking by and attempted to punch him; he missed. Specialist QW, walking behind appellant, saw the attack and swung at PFC KM; he also missed. Private First Class RR observed SPC QW's attack on his friend and struck SPC QW, knocking him to the ground. Private First Class RR and some others kicked SPC QW while he was curled up on the ground. Soon thereafter, the Lodge's security team moved in and broke up the fight. The security team pulled

---

[1] Appellant's other allegation of error is that he had no intent to kill and therefore his convictions for murder and attempted murder are legally and factually insufficient. We conclude that the evidence in the record supports the finding that appellant fired seven shots at Private First Class (PFC) DM, one of which struck and killed Staff Sergeant (SSG) TH. We find that there is sufficient evidence for a reasonable factfinder to conclude that appellant had the intent to kill. Further, reviewing the record under our mandate under Art 66(c), UCMJ, we conclude that appellant possessed the requisite intent for the attempted murder of PFC DM. Finally, under the elements of Article 118*a*.(2), UCMJ (intent to kill a person), and under the doctrine of transferred intent, we are satisfied of the accused's guilt of the murder of SSG TH.

the combatants out of the fray, escorted them to the front and expelled them from the club. Staff Sergeant TH took no part in the altercation.

Private First Class RR and appellant were the first to be ejected from the club. Initially, they both put up their fists and glared at each other. Before an actual resumption of the fight, PFC KM was kicked out of the club. With the odds then two against one, appellant took off running to his car. Private First Class KM wanted to continue the fight, making statements such as "let's get him."

Appellant rounded the corner of the building to the rear parking lot of the Lodge, went to his car unimpeded, and retrieved his loaded 9 millimeter Ruger semi-automatic handgun. He then walked back towards the front of the Lodge. Meanwhile, PFC KM and PFC RR headed over to where appellant turned the corner. Appellant pointed the gun at PFC RR who, upon seeing the gun, held up his hands and said "I ain't got no gun." Private First Class KM said to appellant "[y]ou're not gonna do nothing with [the gun]." Appellant then shot PFC RR, first in the right leg, and then in the left leg.[2]

Around the time appellant was retrieving his gun, SSG TH, SSG TH's wife, and PFC DM exited the club. Private First Class DM started over to join PFC KM. None of them saw appellant at that time. At the sound of gun shots, everyone ducked. Private First Class DM ducked behind a Ford Fiesta. In the lull between shots, SSG TH stood up and called for PFC DM to come back. Private First Class DM peeked his head up and saw appellant raising his weapon. He ducked back down behind the car. Staff Sergeant TH, who was several car-lengths away, turned around and headed back to his wife. At that moment, appellant recommenced firing. Appellant fired seven shots in the direction of PFC DM, hitting a car between appellant and the car PFC DM was using for cover. One of his shots caught SSG TH in the back of the head. SSG TH died almost immediately, as his wife applied pressure to his wound.

Appellant went back to his car and retrieved a second magazine. As he headed back to his car, PFC KM began to chase him. When PFC KM was a little over a car length away, appellant reloaded a second magazine and again commenced firing. Private First Class KM retreated and appellant pursued him. Appellant approached the car PFC KM was using for cover, and continued his shooting. At some point, PFC KM received an injury from a bullet fragment or other debris. After PFC KM ran completely out of the parking lot, appellant went back to his car and drove away.

---

[2] The bullets were hollow point rounds. One bullet passed completely through PFC RR's left leg, while the other left several fragments embedded in RR's right leg.

3

*A. The evidence*

At the time of the shooting, the Clarksville Police Department was conducting a sting operation on a business a few blocks away. The police officers were able to hear and count the gun shots as they occurred. The dash camera of their police car recorded the gunfire. Due to the proximity of the two events, the police officers responded to the crime scene within minutes of the shooting.[3]

The Lodge security camera facing the rear parking lot recorded appellant's approach to his car, retrieval of his weapon, and return to the Lodge. Appellant took approximately 25 seconds to get to his car, grab his handgun and walk back towards the front of the Lodge. Neither PFC KM nor PFC RR appear on the video during this time. The video also recorded appellant's retrieval of his second magazine, PFC KM's approach towards appellant's car, appellant's resumption of the attack, PFC KM's retreat, and appellant's departure from the scene.

The morning after the shooting, the police arrested appellant. In his car they found the handgun. A search of his phone uncovered appellant's online search of topics such as "fingerprints on bullet casings."

The police recovered nineteen empty cartridges and one unexpended round from the ground in the Lodge's parking lot.

At trial, witness testimony included members of both groups of friends. Though there were slight variations on the sequence of events, the basic facts were not controverted. Appellant's friends did not exit the club until the commencement of the shooting and ran in the opposite direction. Appellant's statements to the police were not admitted and appellant did not testify at trial.

**DISCUSSION**

Before this court, appellant asserts that the evidence is legally and factually insufficient to prove beyond a reasonable doubt that he was not lawfully acting in self-defense.

We conduct a de novo review of the legal and factual sufficiency of a case. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57

---

[3] One responding police officer took down partial license plate numbers of three cars he saw at an intersection near the Lodge. Based on the descriptions of the cars and the partial license plate numbers, the police were able to determine the identity of appellant.

M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987)). The test for factual sufficiency "is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," this court is "convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 MJ at 325.

Rules for Courts-Martial 916(e)(1) sets out the elements of the defense of self-defense. An accused must have:

> (A) Apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the accused; and

> (B) Believed that the force the accused used was necessary for protection against death or grievous bodily harm.

Each of these elements has a subjective component. That is, an accused must actually apprehend the threat and believe the force used is necessary to counter the threat. "The first element . . . has an objective component, involving the perception of a reasonable person under the circumstances. The second element . . . is wholly subjective, involving the personal belief of the accused, even if not objectively reasonable." *United States v. Dobson*, 63 M.J. 1, 11 (C.A.A.F. 2006).

*A. Appellant's apprehension of harm viewed objectively*

For the objective component of self-defense, the test "is whether, considering all the circumstances, a reasonable, prudent person would believe there was ground to fear death or grievous bodily harm." *United States v. Jackson*, 15 U.S.C.M.A. 603, 608, 36 C.M.R. 101, 106 (1966); *See* Dep't of Army Pam. 27-9, Legal Service: Military Judges' Benchbook, para. 5-2-1 (10 Sep. 2014).

Before going back to his car and getting his handgun, appellant faced two unarmed individuals. Under the circumstances, it was reasonable to conclude that both individuals were likely to continue the previous fight. Private First Class RR squared up to fight and PFC KM made statements indicating his desire to fight. At that time none of the individuals had weapons, a fact known by all as they had all been searched entering the Lodge.

"Generally speaking, a person is not entitled to use a dangerous weapon in self-defense where the attacking party is unarmed and commits a battery by means of his fist." *United States v. Cardwell*, 15 M.J. 124, 126 (1983). However, there can be times where "one can reasonably be put in fear of death or grievous bodily harm by force of numbers, or other factors, without being attacked with a weapon." *United States v. Gordon*, 14 U.S.C.M.A. 314, 323, 34 C.M.R. 94, 103 (1963) (citing *United States v Regalado*, 13 U.S.C.M.A. 480, 484, 33 C.M.R. 12, 16 (1963)).

Here, we do not have to reach the conclusion whether this was one of those scenarios, because appellant withdrew from the confrontation. Even though appellant was in a place he was lawfully allowed to be and therefore had no duty to withdraw, he chose to leave and return to his car. The evidence clearly shows that neither PFC RR nor PFC KM followed appellant when he withdrew from the confrontation. Any reasonable belief that there were grounds to fear immediate death or serious bodily harm ceased when appellant went to his car unmolested and without aggressors in his vicinity.

The question then becomes whether appellant regained the right to self-defense and the right to employ deadly force when he returned to confront PFC KM and PFC RR?[4] "Even a person who starts an affray is entitled to use self-defense when the opposing party escalates the level of the conflict." *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007) (quoting *Cardwell*, 15 M.J. at 126); *See also, United States v. Behenna*, 71 M.J. 228, 233 (C.A.A.F. 2012) ("[A]n initial aggressor or a mutual combatant regains the right to act in self-defense if the other party escalates the degree of force.").

A review of the record does not yield any facts which would support the reasonable conclusion that appellant was in danger of death or serious bodily harm when he returned to the area of the parking lot in the vicinity of PFC KM and PFC RR. While there is evidence that PFC KM was exhorting his friend to "go get him", there is no evidence that he actually pursued appellant. When faced with appellant's weapon, PFC RR stopped, raised his hands and said "I ain't got no gun." PFC KM taunted appellant "[y]ou're not gonna do nothing with [the gun]" but did not threaten appellant. Neither got within striking distance of appellant, nor were they moving toward him. The evidence supports that appellant–not PFC KM or PFC RR– escalated the level of conflict by pointing his pistol and then shooting PFC RR.[5]

After appellant shot PFC RR, PFC RR turned around and walked away. Private First Class KM and PFC DM took cover behind cars in the parking lot. There is no evidence that any of them made an attempt to attack appellant. Applying

---

[4] Appellant also argues he returned from his car because his friend was in danger. There is no evidence in the record as to the reason why appellant returned. There is also no evidence in the record that either of his friends were threatened in any way once they left the Lodge. The issue of defense of another was not reasonably raised at trial. Trial Defense Counsel did not ask for an instruction on defense of another, nor did the defense mention it in their closing argument.

[5] We conclude that PFC KM and PFC RR could not escalate the level of force at this point because appellant had already introduced deadly force into the situation. *See United States v Stanley*, 71 M.J. 60, 63 (C.A.A.F. 2012); *Behenna*, 71 MJ at 235-236.

6

the standard of an ordinary prudent adult, it was not objectively reasonable for appellant to believe he was in serious danger at the time he emptied his first magazine, missing PFC DM and killing SSG TH.

The last individual to be injured was PFC KM. During a lull in the shooting as appellant returned to his car to retrieve an additional magazine, PFC KM approached appellant. He got approximately a car-length away before appellant reloaded. Again applying the objective test for self-defense, it was not reasonable for appellant to perceive PFC KM as a serious threat. At this point, PFC KM was alone and unarmed. While he was bigger than appellant, there is no other evidence to suggest that he had the ability to inflict serious bodily harm, let alone death.[6] More to the point, when he saw appellant step back out with his gun, PFC KM turned and ran, hid behind a vehicle, and fled the parking lot as appellant fired seven more shots.

Appellant argues that one cannot parse the confrontation into different events; that the attack commenced with PFC KM swinging at appellant in the Lodge and did not end until appellant drove away. After a review of the record, we find this argument unpersuasive. In some circumstances thirty seconds may not be long enough to constitute a break between confrontations. But here, where the evidence clearly shows appellant removing himself from the confrontation,[7] unpursued and unchallenged, we find his act of retrieving his weapon and returning similar to that in *United States v. Ginn*, 4 C.M.R. 50 (1952), as opposed to the circumstances in *Cardwell*.

In *Ginn,* the Court held the accused lost the right of self-defense when he renewed the conflict after leaving the location to procure a weapon. *Ginn*, 4 C.M.R. at 50. It is true that the break in conflict in that case consisted of hours, not seconds. However, the logic of *Ginn* that "[o]nce out of danger, he could not return, threaten, kill, and then claim self-defense" is the same. *Id.* By contrast, the accused in *Cardwell* used a beer bottle to defend himself against an unarmed opponent who was strangling him. The court did not consider the accused's use of the beer bottle as an escalation, although it did consider it a dangerous weapon, as the escalation

---

[6] The record shows that PFC KM's demonstrated fighting prowess consisted of swinging at appellant while in the Lodge and missing.

[7] Appellant argues that as part of his right to stand his ground he could "deliberately arm himself for purposes of self-defense against a pernicious assault which he has good reason to expect." *Stanley*, 71 MJ at 63 (citations omitted). We do not read *Stanley* for this proposition. In fact the accused in *Stanley* was not allowed to argue self-defense when one of the men he was holding at gun-point grabbed for a knife. The Court found that *Stanley* had brought deadly force into the fight and lost his ability to claim self-defense. *Id.*

had already taken place. 15 M.J. at 126. We find appellant escalated the confrontation with his introduction of the handgun, and his basis for using deadly force was not objectively reasonable.

### B. Appellant's subjective belief

Even if we concluded the threat of death or grievous bodily harm was reasonable, appellant did not meet the second element of self-defense. This subjective test requires "that the accused believe that the force he used was necessary for his protection against death or grievous bodily harm." *United States v. Bradford*, 29 M.J. 829, 833 (A.C.M.R. 1989). Instead of a reasonable and prudent adult, we place ourselves in the shoes of the appellant.

In this case, the record is devoid of direct evidence regarding appellant's subjective belief. There is no requirement that an accused himself testify in order to raise the issue of self-defense. *United States v. Curtis*, 1 M.J. 297, 298 n.1 (C.M.A. 1976). The evidence, however, must come from somewhere. In this case we have appellant's own actions, captured on video and reflected in witness testimony and forensic evidence. Appellant walked, deliberately and calmly, back into the confrontation after having ample time to retrieve his handgun. In total, he fired nineteen rounds at unarmed opponents, returning to his car to reload in the process. He was never seriously threatened or harmed. Reviewing the entire record, we conclude beyond a reasonable doubt that appellant did not honestly believe the force he used was necessary for protection against death or grievous bodily harm.

### CONCLUSION

Under these facts and circumstances, we are convinced a reasonable factfinder could have found beyond a reasonable doubt that appellant did not act in self-defense and was guilty of murder, attempted murder, and aggravated assault. We are likewise convinced of the appellant's guilt. We therefore find appellant's conviction for this offense legally and factually sufficient.

Upon consideration of the entire record, the findings and sentence as adjudged and approved by the convening authority are AFFIRMED.

Senior Judge BURTON and Judge HAGLER concur.

FOR THE COURT:

JOHN P. TAITT
Chief Deputy Clerk of Court