# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

### No. ACM 38879

————————————

### UNITED STATES
*Appellee*

**v.**

### Jaren T. BISHOP
Airman First Class (E-3), USAF, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 2 February 2017

————————————

*Military Judge:* Marvin W. Tubbs II (sitting alone).

*Approved sentence:* Dishonorable discharge, confinement for 3 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 21 May 2015 by GCM convened at Little Rock Air Force Base, Arkansas.

*For Appellant:* Captain Travis L. Vaughan, USAF.

*For Appellee:* Major J. Ronald Steelman III, USAF; Gerald R. Bruce, Esquire; and Ms. Morgan L. Herrell (civilian intern).[1]

Before MAYBERRY, SPERANZA, and JOHNSON, *Appellate Military Judges*.

Judge JOHNSON delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge SPERANZA joined.

————————————

### PUBLISHED OPINION OF THE COURT

————————————

[1] Ms. Herrell was a law student extern with the Air Force Legal Operations Agency and was at all times supervised by attorneys admitted to practice before this court during her participation.

JOHNSON, Judge:

A general court-martial composed of a military judge sitting alone found Appellant guilty contrary to his pleas of one specification of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920. The court-martial sentenced Appellant to a dishonorable discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to E-1. The convening authority approved the sentence as adjudged.

Before us, Appellant raises six assignments of error: (1) the evidence is legally and factually insufficient to support his conviction; (2) the military judge erred in admitting uncorroborated portions of Appellant's oral and written statements to investigators; (3) the military judge erred in denying the Defense motion to compel expert assistance, discovery, and production related to the victim's phone; (4) the military judge erred in partially denying the Defense motion under Military Rule of Evidence (Mil. R. Evid.) 412; (5) the military judge erred in partially denying the Defense motion under Mil. R. Evid. 513; and (6) the military judge erred in denying the Defense motion to suppress a text exchange between Appellant and the victim and Appellant's statements to investigators.[2] We find no relief is warranted and thus affirm the findings and sentence.

## I. BACKGROUND

Appellant was a member of the security forces squadron at Little Rock Air Force Base, Arkansas. Airman First Class (A1C) JS was a member of the same squadron and an acquaintance of Appellant. A1C JS was also a good friend of Appellant's ex-wife, Staff Sergeant (SSgt) AC, who was assigned to the same base.

At approximately 2230 on 4 July 2014, A1C JS returned to her off-base house after a difficult day on the swing shift. Around 2300, two other female Airmen visited A1C JS at her house for approximately three hours. In her trial testimony, A1C JS estimated she drank one bottle of beer and approximately one and a half bottles of pre-mixed liquor during this time. Sometime after the two visitors left around 0200 on 5 July 2014, A1C JS sent a text message to Appellant asking him if he could give her a ride onto the base the next day, writing "Can you give me a ride tomorrow I'm really drunk."[3] In the course of a brief text conversation, Appellant agreed. After a 17-minute lull in their text

---

[2] Appellant personally raises the fourth, fifth, and sixth assignments of error pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] A1C JS's on-base driving privileges had been revoked at the time.

exchange, during which A1C JS continued texting with two other individuals, Appellant reinitiated texting. After another brief exchange, A1C JS invited Appellant to come to her house to "hang out." Appellant accepted. In the following half hour before Appellant arrived, A1C JS invited several other individuals to her house, including Appellant's ex-wife SSgt AC, but no one else came.

When Appellant arrived, A1C JS prepared a drink for him, she told him about her upsetting day at work, and they watched television for a time. They were alone in the house. A1C JS later described herself as "pretty drunk" by this point and she was still drinking. Eventually, Appellant moved close to A1C JS and leaned towards her in what she believed was an attempt to kiss her. A1C JS had no previous romantic or sexual involvement with Appellant, and in her testimony she denied having any interest in such involvement. After Appellant moved toward her, A1C JS jumped up, ran to her bedroom, and tried unsuccessfully to shut the door. Appellant called out to her asking what was wrong. A1C JS began to hyperventilate and she vomited on the floor of her bedroom. She responded to Appellant, telling him she was throwing up and just wanted to go to bed. She went to her bathroom and locked the door. Then she went to her bathroom closet, created impromptu bedding for herself from clothing, laid down, and fell asleep.

A1C JS had no memory of anything that occurred after that point until her alarm went off at 0800 hours, when she found herself naked in her bed with Appellant pressed up against her. She felt a throbbing pain and was bleeding in her vagina. When Appellant awoke, he attempted to initiate sex with her but A1C JS refused. Later Appellant, who had brought his uniform with him, got dressed, and A1C JS rode with him to a unit event on base. When A1C JS returned home, she spent the rest of the weekend cleaning her house. Significantly, she found and cleaned a small amount of feces in her bathroom on the outside base of the toilet.

On 7 July 2014, A1C JS reported the sexual assault and submitted to an examination that indicated the presence of DNA consistent with Appellant's in her vagina. That same day, A1C JS was interviewed by agents of the Air Force Office of Special Investigations (AFOSI), and she agreed to allow them to observe a text exchange she initiated with Appellant. In the course of the exchange, A1C JS stated she did not remember what happened. Appellant wrote that A1C JS had gone to the bathroom for a long time and he thought she may have passed out. He found her "knocked out naked in [her] closet." Appellant further wrote that he "picked [her] up and put [her] in bed then [she] got up and was hyper as f**k." According to Appellant, A1C JS then invited Appellant to join her in the shower, which he did, and they "had sex" there. They then moved to the bed where they engaged in sexual intercourse for "almost 2 hours"

before Appellant ejaculated on A1C JS's breasts. Appellant concluded with "I'm sorry :( I thought u were conscious enough to know I feel terrible."

Appellant was subsequently interviewed by AFOSI agents and agreed to provide oral and written statements. His account largely corroborated A1C JS's subsequent testimony as to the events she could remember. As to events she could not remember, he elaborated on the version he texted to A1C JS. In particular, he explained he was able to open the locked bathroom door when he found a key above the doorway. He further described finding A1C JS in her bathroom closet, lying unconscious on her stomach, naked from the waist down, with feces "smeared all over her buttocks." He attempted to awaken her three times by tapping her on the shoulder, but she did not respond. Nevertheless, Appellant maintained that after he attempted to move A1C JS to her bed, she suddenly became hyperactive, alert, and the initiator of the subsequent sexual activity.

## II. DISCUSSION

### A. Defense Motion to Compel Expert Assistance, Discovery, and Production

Appellant contends the military judge abused his discretion by denying both the Defense motion to compel expert assistance in the field of computer forensics and the motion to compel discovery and production of the victim's cell phone. Appellant's assignment of error combines two distinct issues which we consider in turn, beginning with the discovery and production of the victim's phone.

We review a military judge's ruling on requests for discovery or production of evidence for an abuse of discretion. *United States v. Jones*, 69 M.J. 294, 298 (C.A.A.F 2011); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). An abuse of discretion occurs when the military judge's findings of fact are clearly erroneous or when his ruling is influenced by an erroneous view of the law. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).

Each party to a court-martial must have an equal opportunity to inspect evidence and to obtain witnesses and other evidence. *United States v. Stellato*, 74 M.J. 473, 483 (C.A.A.F. 2015) (citing Rule for Courts-Martial (R.C.M.) 701(e) and Article 46, UCMJ, 10 U.S.C. § 846). The Court of Appeals for the Armed Forces (CAAF) "has interpreted this requirement to mean that the 'Government has a duty to use good faith and due diligence to preserve and protect evidence and make it available to the accused.'" *Id.* (quoting *United States v. Kern*, 22 M.J. 49, 51 (C.M.A. 1986)). The duty to preserve includes (1) evidence that has an apparent exculpatory value and that has no comparable substitute; (2) evidence of such central importance to the Defense that it is essential to a

fair trial; and (3) statements of witnesses testifying at trial. *Id.* (citations omitted).

Each party is entitled to the production of evidence which is relevant and necessary. R.C.M. 703(f)(1); *Rodriguez*, 60 M.J. at 246. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is 'necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue.'" *Rodriguez*, 60 M.J. at 246 (quoting R.C.M. 703((f)(1) Discussion).

AFOSI agents extracted data from A1C JS's cell phone on 7 July 2014 before returning the phone to her. The Government did not thereafter seek or obtain possession of her phone. However, trial defense counsel were provided with electronic copies of the extracted data. At trial, the Defense sought to compel the Government to secure A1C JS's phone to enable trial defense counsel to access it. The Defense essentially advanced two arguments: (1) The Defense needed to examine A1C JS's phone to determine whether there was additional data on the phone as of 7 July 2014 that had not been captured by AFOSI's extraction; and (2) There were text messages on the phone sent after the extraction that were potentially useful to the Defense, pointing to A1C JS's testimony that she had sent messages after 7 July 2014 regarding her thoughts and feelings about the sexual assault and the facts of the case.

The military judge denied the Defense motion. In an oral ruling, he found A1C JS's phone was not in the possession of the Government, and, therefore, discovery under R.C.M. 701 was not applicable. Turning to production under R.C.M. 703, the military judge found that although A1C JS testified she sent text messages about the sexual assault after 7 July 2014, the Defense had produced no evidence as to what those messages were nor to whom they were sent. Therefore, the military judge could not determine that they were relevant or necessary, and thus they did not meet the standard for compelling production under R.C.M. 703.

We find the military judge did not abuse his discretion. With regard to the Government's duty to preserve evidence, AFOSI extracted the data on A1C JS's phone as of 7 July 2014 before returning the phone to her. The Defense was subsequently provided a copy of the extracted data. There was no showing that the copy of the data extracted by AFOSI in fact omitted any evidence of relevance to the case that was on the phone as of 7 July 2014. Thus, the Government fulfilled its duty of good faith and due diligence to preserve evidence of apparent exculpatory value or of such central importance to the Defense that it was essential to a fair trial. *See Stellato*, 74 M.J. at 483.

With regard to the phone itself, we agree with the military judge that once it was returned to A1C JS it was no longer in the Government's possession, and, therefore, the appropriate analysis is production under R.C.M. 703(f) rather than discovery under R.C.M. 701. As the moving party, the Defense bore the burden of persuading the trial court that production of A1C JS's phone was required to obtain relevant and necessary evidence. R.C.M. 905(c)(2)(A), 906(b)(7); *see Rodriguez*, 60 M.J. at 246. Trial defense counsel offered no specific information that any particular relevant evidence not already in the possession of the Defense was on the phone. A1C JS's general statement that she sent text messages about the incident after 7 July 2014 was, standing alone, insufficient to demonstrate relevance or necessity.[4] This was not necessarily an impossible burden for trial defense counsel; for example, they might have learned of the existence of specific relevant and necessary text messages from interviewing the victim's friends and associates and used such information to bolster their motion. But that was not the case here.

Turning to the Defense motion to compel the assistance of an expert in computer forensics, "[a] military judge's ruling on a request for expert assistance is reviewed for an abuse of discretion." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citing *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005)). An accused is entitled to expert assistance when necessary for an adequate defense. *Freeman*, 65 M.J. at 458. The mere possibility of assistance is not a sufficient basis; "[i]nstead, the accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial." *Id.* (citations omitted). "To establish the first prong, the accused 'must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop.'" *Id.* (quoting *Bresnahan*, 62 M.J. at 143). "Defense counsel are expected to educate themselves to attain competence in defending an issue presented in a particular case." *United States v. Kelly*, 39 M.J. 235, 238 (C.A.A.F. 1994).

Trial defense counsel sought and were granted the assistance of expert consultants in forensic toxicology, forensic psychology, forensic biology, and forensic sexual assault nurse examination. However, their request for an expert consultant in computer forensics was denied by the convening authority. At trial, the Defense sought to compel such an expert to assist trial defense counsel both to understand and analyze the data already extracted from Appellant's and

---

[4] Significantly, Airman First Class (A1C) JS testified she did not send any text messages from her phone to Appellant after 7 July 2014.

A1C JS's phones and provided to the Defense, and to examine the phones themselves. As to the extracted data provided by the Government, trial defense counsel argued they "lack[ed] the skill or ability to sort, analyze, review, or understand this digital evidence. Indeed, the Defense has had difficulty even opening some of the files involved, and the Defense does not have the skill, tools, or software to try to resolve those issues." However, during argument on the motion trial defense counsel conceded they had not sought AFOSI's assistance in opening the files provided by AFOSI. With regard to analyzing the phones themselves, trial defense counsel relied on a general statement provided by their requested computer forensics expert stating the type of data extraction AFOSI performs "is often not all of the data that is contained in the device and that may be relevant to the case."

The military judge denied the motion to compel and provided a written ruling. In his findings of fact, the military judge summarized the extracted material in trial defense counsel's possession before noting "[t]he Defense did not present any evidence to show that these files were not accessible to them nor was any evidence submitted that demonstrated the content of the files was beyond the ability of the Defense to analyze and sort." Therefore, after reciting the applicable standards set forth in *Freeman*, 65 M.J. at 458, the military judge concluded trial defense counsel had not met their burden of persuasion that expert assistance in computer forensics was needed, or that the lack of such assistance would result in a fundamentally unfair trial.

We find no abuse of discretion. The military judge's findings of fact are supported by the record and he applied the correct legal standards in denying the motion to compel expert assistance. While it is possible such expertise might have assisted Appellant at trial, a possibility alone is not sufficient. *See id.* In the absence of any factual showing—as opposed to mere argument—that trial defense counsel were unable to access the data provided, with or without government assistance; that trial defense counsel attempted to educate themselves sufficiently to understand the data provided; or that expert assistance would have enabled them to access any additional relevant and necessary information not already in their possession, the Defense failed to meet its burden to demonstrate either that the requested expertise was needed or that denial resulted in a fundamentally unfair trial. *See id.*

## B. Corroboration of References to Feces in Appellant's Admissions

In his oral and written statements to AFOSI, Appellant described A1C JS as having feces smeared on her buttocks when he found her, unconscious and naked from the waist down, in her bathroom closet. The presence of feces on the victim's body became a focal point of both the AFOSI interview and litigation at trial. Appellant now contends the military judge erred in denying the

Defense motion to suppress his references to feces on A1C JS's body in his written and video-recorded oral statements to AFOSI as an uncorroborated admission inadmissible under Mil. R. Evid. 304.

Mil. R. Evid. 304(c)(1) provides: "An admission or a confession of the accused may be considered as evidence against the accused on the question of guilt or innocence only if independent evidence, either direct or circumstantial, has been admitted into evidence that would tend to establish the trustworthiness of the admission or confession." The version of Mil. R. Evid. 304(c)(4) in effect at the time of Appellant's trial further provided:

> The independent evidence necessary to establish corroboration need not be sufficient of itself to establish beyond a reasonable doubt the truth of the facts stated in the admission or confession. The independent evidence need raise only an inference of the truth of the essential facts admitted. The amount and type of evidence introduced as corroboration is a factor to be considered by the trier of fact in determining the weight, if any, to be given to the admission or confession.[5]

Interpreting this rule, the CAAF explained, "M[il]. R. E[vid]. 304(c) requires an amount of independent evidence sufficient to justify an inference of truth of the essential facts admitted from the confession [or admission]." *United States v. Adams*, 74 M.J. 137, 140 (C.A.A.F. 2015). "What constitutes an essential fact of an admission or confession necessarily varies by case." *Id.* "If sufficient corroborating evidence of an essential fact is not provided, then the uncorroborated fact is not admissible and the military judge must excise it from the confession [or admission]." *Id.* "There is no 'tipping point' of corroboration which would allow admission of the entire confession." *Id.* In other words, each essential fact must be individually corroborated by independent evidence sufficient to create an inference of the truth of that admitted fact. The

---

[5] After Appellant's trial, Executive Order 13,730 amended Mil. R. Evid. 304(c) to remove the individual corroboration requirement for "essential facts" and instead require corroboration only for the confession or admission as a whole. Exec. Order 13,730, 81 Fed. Reg. 33,350–51 (26 May 2016). For example, Mil. R. Evid. 304(c)(2) currently reads in part: "Not every element or fact contained in the confession or admission must be independently proven for the confession or admission to be admitted into evidence in its entirety." *Id.* at 33,350. Thus the CAAF's analysis of the prior version of Mil. R. Evid. 304(c) in *United States v. Adams*, 74 M.J. 137 (C.A.A.F. 2015), discussed here, while appropriately guiding the military judge's ruling in Appellant's trial, has been rendered moot for current trial practice by a subsequent change to the rule.

amount of independent evidence required may be "slight" so long as it creates an inference of truth. *Id.* (citations omitted).

In an oral ruling, the military judge denied the Defense motion to suppress under Mil. R. Evid. 304. Applying the applicable legal standards from Mil. R. Evid. 304 and *Adams*, he found Appellant's admissions that A1C JS had feces on her body when he found her on the floor of her bathroom closet in the early hours of 5 July 2014 were sufficiently corroborated by A1C JS's testimony that she found a small amount of feces on the outside of the base of her toilet when she cleaned her bathroom later that same day.

Appellant contends that finding feces on A1C JS's toilet, in the absence of any evidence of feces found on her clothes, bed, or closet, was insufficient corroboration. We disagree. A slight amount of corroboration may be sufficient, *see Adams*, 74 M.J. at 140, and we find the military judge did not abuse his discretion in concluding that feces on the outside base of the toilet was sufficient corroboration that A1C JS had feces on her naked buttocks on the floor of the closet bathroom earlier the same day.

We are not persuaded by Appellant's comparison of the instant case to *United States v. Perez*, ACM 38559 (A.F. Ct. Crim. App. 12 Aug. 2015) (unpub. op.). In *Perez*, this court found the military judge abused his discretion by failing to require the prosecution to offer independent corroboration of each essential fact the Government relied on in securing a conviction, as required by *Adams*.[6] *Id.* at 8–11. Appellant argues his case is similar because the military judge used an unrelated fact to corroborate an essential fact. We disagree. In Appellant's case, unlike *Perez*, the military judge employed the applicable standard for corroboration set forth in *Adams* and applied it to the particular essential fact challenged by trial defense counsel. His conclusion was factually and legally sound and we find no error.

## C. Legal and Factual Sufficiency

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of legal and factual sufficiency is limited to

---

[6] At the time Perez was tried, *Adam*s had not been decided. The panel in *Perez* acknowledged the military judge's conclusions "may have been a reasonable application of pre-*Adams* case law," but recognized "courts on direct review apply the law at the time of the appeal, not the time of trial." *United States v. Perez*, ACM 38559, unpub. op. at 9 (A.F. Ct. Crim. App. 12 Aug. 2015) (citing *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010)).

the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term "reasonable doubt" does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325; *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

Appellant was convicted of a single specification of sexual assault under Article 120, UCMJ. To sustain a conviction for sexual assault, the prosecution was required to prove: (1) Appellant committed a sexual act upon A1C JS, to wit: penetrating her vulva with his penis; and (2) Appellant did so when A1C JS was incapable of consenting to the sexual act due to impairment by an intoxicant, and that condition was known or reasonably should have been known to Appellant. *See* Department of the Army Pamphlet 27-9, Military Judges' Benchbook, 3-45-14. Appellant contends his conviction is legally and factually insufficient in light of the CAAF's recent decision in *United States v. Pease*, 75 MJ 180 (C.A.A.F. 2016). In *Pease*, our superior court found the Navy-Marine Corps Court of Criminal Appeals applied the proper definition of "incapable of consenting" when it overturned the appellant's convictions for sexual assault and abusive sexual contact under Article 120, UCMJ. *Id.* at 182. Specifically, the CAAF endorsed the following definition: "'lack[ing] the cognitive ability to appreciate the sexual conduct in question or [lacking] the physical or mental ability to make [or] to communicate a decision about whether they agreed to

the conduct.'"[7] *Id.* at 185-86 (quoting *United States v. Pease*, 74 M.J. 763, 770 (N-M. Ct. Crim. App. 2015)).

According to Appellant, his own statements to AFOSI—introduced by the Government at trial—that the victim was conscious, mobile, and not only communicated her agreement but initiated the sexual activity fatally undermines the Government's case in light of the definition of "incapable of consenting" articulated in *Pease*. Appellant characterizes trial counsel's closing argument as "effectively conceding" that A1C JS had awakened and was moving about, and Appellant contends evidence that A1C JS was drunk and her executive functioning was impaired was, without more, insufficient to prove she was incapable of consenting. Appellant argues his statements to AFOSI, coupled with evidence of A1C JS's motives to fabricate, her character for untruthfulness, and scientific evidence that she could have made and communicated consent while later not remembering the events, establish a reasonable doubt as to his guilt.

We disagree. Appellant's statements to investigators offered by the prosecution corroborated important aspects of A1C JS's testimony and added substantial additional evidence that she was, in fact, incapable of consenting—for example, that Appellant found her on the floor of her closet unconscious, unresponsive, half-naked, and with feces smeared on her buttocks. However, trial counsel was not bound to accept the entirety of Appellant's statements at face value; nor did they. Trial counsel's argument on findings is replete with challenges to the credibility of various contradictory and self-serving aspects of Appellant's statements. Similarly, the military judge was not required to accept Appellant's statements wholesale merely because there was no other witness to events from the time A1C JS fell asleep in her bathroom closet until her alarm woke her at 0800. Nor are we so constrained.

The Government presented evidence that on the night in question A1C JS drank at least one bottle of beer and one and a half bottles of mixed liquor over the course of approximately three to four hours. She described herself to Appellant as "really drunk" and "wasted" before he arrived, and Appellant later described her to investigators as "pretty drunk." After Appellant moved toward

---

[7] The CAAF found the Navy-Marine Corps Court of Criminal Appeals (NMCCA) misstated the definition as lacking the ability "to make *and* to communicate a decision," rather than "to make *or* to communicate a decision." *United States v. Pease*, 75 M.J. 180, 186 (C.A.A.F. 2016) (citing *United States v. Pease*, 74 M.J. 763, 770 (N-M. Ct. Crim. App. 2015)) (emphasis added). However, notwithstanding this "scrivener's error," the CAAF found the NMCCA in fact applied the correct definition in overturning the appellant's Article 120 convictions. *Id.*

her, A1C JS fled to her bedroom where she vomited on the floor. She then re-treated to her bathroom, which she locked in order to keep Appellant out. She made a bed for herself from the clothes in her closet, lay down, and fell asleep. Appellant gained access to the bathroom when he found a key above the door. He found A1C JS on the floor of her bathroom closet, unconscious and naked from the waist down, with feces smeared on her buttocks. She did not respond when he repeatedly attempted to awaken her. When A1C JS awoke at 0800, she was lying naked next to Appellant with pain and bleeding in her vagina. Appellant later informed her they had sexual intercourse. Evidence of DNA consistent with Appellant's was subsequently found on swabs of her vagina taken after she reported the assault two days later. Drawing "every reasonable inference from the evidence of record in favor of the prosecution," *see Barner*, 56 M.J. at 134, the evidence was legally sufficient to support a finding that Appellant's penis penetrated A1C JS's vulva, that A1C JS was incapable of consenting due to impairment by an intoxicant, and that condition was known or reasonably should have been known to Appellant. Thus Appellant's conviction for sexual assault is legally sufficient.

Turning to factual sufficiency, several factors undermine the credibility of Appellant's account of events from the time he found A1C JS unconscious to the time she awoke later that morning. Appellant's version is evidently self-serving. His claim that A1C JS suddenly, in his words, "sprang back to life, completely hyper running around the house," before initiating a marathon of sexual intercourse with Appellant first in the shower and then pulling him to her bed strains credulity. AFOSI investigators challenged him on several in-consistencies with regard to the timeline and sequence of events, as well as details such as whether and how A1C JS dressed herself after she allegedly awoke and where Appellant ejaculated. Appellant's explanations are uncon-vincing, and he acknowledged lying to A1C JS about ejaculating on her breasts.

At trial the Defense offered opinion testimony from two members of the squadron—one of them a friend of Appellant—that A1C JS had an untruthful character, and testimony from Appellant's friend and the unit first sergeant that A1C JS had a reputation for untruthfulness. The prosecution countered with opinion testimony from four witnesses as A1C JS's truthful character. The Defense also offered evidence that A1C JS was in a romantic relationship with another member of the squadron, SSgt JM, although A1C JS and SSgt JM had argued on 3 July 2014 and were avoiding speaking to one another at the time of the assault. During argument on findings, trial defense counsel proposed A1C JS thus had a motive to fabricate a false allegation of sexual assault to protect her relationship with SSgt JM. There was also evidence A1C JS had previously expressed a desire to leave Little Rock Air Force Base, and that she sought and obtained an expedited transfer to another base one or two months

after she reported the sexual assault. Finally, there was some evidence and expert testimony as to prescription drugs A1C JS may have been taking at the time and the effects they might have had. In our view, none of this evidence significantly undermines the strong evidence that Appellant penetrated the victim's vulva with his penis, while she was incapable of consenting to the sexual act due to impairment by an intoxicant, and that Appellant either knew or reasonably should have known the victim was incapable of consenting. Having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## D. Partial Denial of Mil. R. Evid. 412 Motion

Appellant next asserts the military judge erred by excluding under Mil. R. Evid. 412 evidence of events at a party attended by A1C JS and other Airmen— not including Appellant—that occurred in February 2011, over three years before the charged offense.[8] Trial defense counsel argued the evidence showed A1C JS had previously lied about engaging in sexual activity in order to protect a developing romantic relationship. Therefore, trial defense counsel asserted, the evidence was constitutionally required under the Sixth Amendment in order for the Defense to confront and impeach A1C JS with regard to the charge against Appellant.

"We review the military judge's ruling on whether to exclude evidence pursuant to [Mil. R. Evid.] 412 for an abuse of discretion. Findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo." *United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011) (citation omitted).

Under Mil. R. Evid. 412, evidence offered by the accused to show that the alleged victim engaged in other sexual behavior is inadmissible, with three limited exceptions. The third exception states that the evidence is admissible if "the exclusion of [it] would violate the constitutional rights of the accused." Mil. R. Evid. 412(b)(1)(C). This exception includes an accused's Sixth Amendment right to confront witnesses against him, including the right to cross-examine and impeach those witnesses. *Ellerbrock*, 70 M.J. at 318.

If there is a theory of admissibility under one of the exceptions, the military judge, before admitting the evidence, must conduct a balancing test as outlined in Mil. R. Evid. 412(c)(3) and clarified by *United States v. Gaddis*, 70 M.J. 248, 250 (C.A.A.F. 2011). The test is whether the evidence is "relevant, material,

---

[8] Appellant raises this issue pursuant to *Grostefon*, 12 M.J. at 435.

and the probative value of the evidence outweighs the dangers of unfair preju-dice." *Ellerbrock*, 70 M.J. at 318 (citation omitted). Relevant evidence is any evidence that has "any tendency to make the existence of any fact . . . more probable or less probable than it would be without the evidence." Mil. R. Evid. 401. Evidence is material if it is "of consequence to the determination of [the] appellant's guilt." *United States v. Dorsey*, 16 M.J. 1, 6 (C.M.A. 1983) (citations and internal quotation marks omitted).

In closed proceedings, the military judge received evidence and heard ar-gument from counsel. He concluded in an oral ruling the Defense had failed to show that events involving A1C JS, but not Appellant, that occurred over three years prior to the charged offense were relevant at Appellant's trial. Specifi-cally, the military judge found the Defense offered insufficient evidence to sup-port a conclusion A1C JS had lied or even made an inaccurate statement. The military judge further found that, given the lack of concrete evidence that A1C JS lied about events at the 2011 party, the probative value of the offered testi-mony did not outweigh the danger of unfair prejudice.

We find no abuse of discretion in excluding the evidence. Without deciding whether the military judge was correct in his conclusion that the offered evi-dence had no relevance, we agree that whatever minimal relevance it had was outweighed by the dangers of unfair prejudice. The offered testimony was un-clear as to what question was posed to A1C JS after the prior incident, in re-sponse to which she allegedly lied. Moreover, the incident in question occurred over three years before the charged offense, was unrelated to the charged of-fense, and did not involve Appellant. Trial judges retain "wide latitude" to rea-sonably limit an accused's right to cross-examine a witness based on concerns including harassment, confusion of the issues, or "interrogation that is . . . only marginally relevant." *Ellerbrock*, 70 M.J. at 318 (citations and internal quota-tion marks omitted). The military judge acted within the scope of that latitude.

**E. Partial Denial of Mil. R. Evid. 513 Motion**

Trial defense counsel moved the trial court to compel the production of A1C JS's mental health records. Trial counsel obtained the records and provided them to the military judge. After in camera review, the military judge released some but not all of the records to the parties subject to a protective order. Ap-pellant now asserts the military judge's failure to provide all of the records violated Appellant's Sixth Amendment right to effectively confront A1C JS.[9]

---

[9] Appellant raises this issue pursuant to *Grostefon*, 12 M.J. at 435.

We review a military judge's ruling on a discovery or production request for abuse of discretion. *Stellato*, 74 M.J. at 480. "A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004). "Our review of discovery/disclosure issues utilizes a two-step analysis: first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on the appellant's trial." *Id.* at 325.

Mil. R. Evid. 513(a) provides:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made between the patient and a psychotherapist or an assistant to a psychotherapist, in a case arising under the [UCMJ], if such communication was made for the purpose of facilitating diagnosis or treatment of the patient's mental or emotional condition.

However, the privilege is subject to a number of exceptions. Mil. R. Evid. 513(d). At the time of Appellant's trial, these exceptions expressly included when the records are "constitutionally required." Mil. R. Evid. 513(d)(8) as amended by Exec. Order 13,643, 78 Fed. Reg. 29,559, 29,592 (15 May 2013). A prosecutor may not suppress evidence favorable to an accused upon request, as this violates constitutional notions of due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). When a witness's reliability may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Therefore, the Government violates an accused's due process rights if it withholds evidence that is "exculpatory, substantive evidence, or evidence capable of impeaching the [G]overnment's case," and "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *United States v. Behenna*, 71 M.J. 228, 238 (C.A.A.F. 2012) (quotation marks omitted).

At trial the Defense contended A1C JS's mental health records were required because: (1) they would likely contain information about conditions and drug prescriptions that might have affected her perception of events on the night in question; (2) they would contain information she related to providers about the sexual assault; and (3) they could be used to explore and rebut claims of victim impact during any sentencing proceedings. For these reasons, trial

defense counsel argued, the mental health records should be disclosed to enable the Defense to effectively cross-examine A1C JS in accordance with Appellant's Sixth Amendment right to confrontation. After hearing testimony and argument on the motion and in camera review of the available records, the military judge issued an oral ruling. Subject to a protective order, he released to the parties those records that were responsive to the Defense request and either: (1) were not covered by Mil. R. Evid. 513 because they were not in fact mental health records; (2) were covered by Mil. R. Evid. 513 but referenced the events described in the specification of the charge against Appellant, and were therefore potentially constitutionally required; or (3) were covered by Mil. R. Evid. 513 but were indicative of an inability to remember or a tendency to misperceive events or things on the part of A1C JS, and were, therefore, constitutionally required.

On appeal, Appellant fails to articulate how any specific information contained in the undisclosed records would have impacted his trial in any way, beyond a bare assertion that disclosure would have enabled the Defense to better present its theory of the case and more fully impeach and confront A1C JS. Nevertheless, we have reviewed the undisclosed records. We readily conclude the undisclosed records were neither exculpatory, nor capable of impeaching the Government's case, nor otherwise constitutionally required under notions of due process or to uphold Appellant's right to confrontation under the Sixth Amendment. *See Behenna*, 71 M.J. at 238. Further, we perceive no prospect that the result of the proceeding would have been different had these records been disclosed. *See id.* Accordingly, Appellant's assignment of error is without merit.

## F. Denial of Motion to Suppress Appellant's Statements

Appellant's final assignment of error asserts the military judge erred in denying the Defense motion to suppress his text exchange with A1C JS on 7 July 2014 as well as his subsequent statements to AFOSI agents and all derivative evidence therefrom.[10] Appellant contends the text exchange should have been suppressed because he was not advised of his rights under Article 31, UCMJ, 10 U.S.C. § 831. He further contends his oral and written statements to AFOSI were involuntary because he did not freely and voluntarily waive his Article 31, UCMJ, rights, and because his interviewer made a misstatement of law during the interview.

We review a military judge's ruling on a motion to suppress for an abuse of discretion. *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014). "When there is a motion to suppress a statement on the ground that rights' warnings

---

[10] Appellant raises this issue pursuant to *Grostefon*, 12 M.J. at 435.

were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law de novo." *Id*. Whether a questioner was acting or could reasonably be considered to be acting in a law enforcement or disciplinary capacity is a question of law requiring de novo review. *Id*. at 361.

Article 31, UCMJ, 10 U.S.C. § 831, states in pertinent part:

> (b) No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.
>
> . . .
>
> (d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

"Thus, Article 31(b), UCMJ, warnings are required when (1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *Jones*, 73 M.J. at 361.

In *Jones*, however, our superior court noted that cases involving undercover officials and informants involve unique considerations. The CAAF stated, "Because undercover officials and informants do not usually place the accused in a position where a reasonable person in the accused's position would feel compelled to reply to questions, . . . logic dictates that Article 31(b), UCMJ, would not apply in those situations." *Id*. at 361, n.5. Modifying its previous ruling in *United States v. Duga*, 10 M.J. 206 (C.M.A. 1981), the *Jones* court adopted a two-prong test for determining whether statements by an accused to informants and undercover officials must be suppressed. The first prong is whether the person who conducted the questioning was "'participating in an official law enforcement or disciplinary investigation or inquiry,' as opposed to having a personal motivation for the inquiry." *Id*. at 361 (quoting *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000)). The second prong applies an objective standard of a reasonable person in the suspect's position to determine whether that person would have concluded that the questioner was acting in an official law enforcement or disciplinary capacity. *Id*. at 362.

The voluntariness of a confession is a question of law this court reviews de novo for an abuse of discretion. *Freeman*, 65 M.J. at 453. "A confession is involuntary, and thus inadmissible, if it was obtained 'in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement.'" *Id*. (quoting Mil. R. Evid. 304(a)(1)(a)). "We examine 'the totality of the surrounding circumstances' to determine 'whether the confession is the product of an essentially free and unconstrained choice by its maker.'" *Id*. (quoting *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F. 1996)).

At trial, the Defense moved to suppress the pretext text messages between A1C JS and Appellant that AFOSI observed on 7 July 2014, and all evidence derived therefrom, as obtained in violation of Appellant's rights under Article 31, UCMJ. In addition, the Defense moved to suppress Appellant's oral and written statements made during his AFOSI interview, as well as evidence derived therefrom, due to a separate alleged Article 31, UCMJ, violation. On appeal, Appellant personally reasserts the arguments set forth in the suppression motion. In addition, although not argued at trial, Appellant now appears to contend that a misrepresentation during the interview by AFOSI agents regarding the legal standard for capability to consent to a sexual act rendered Appellant's statement involuntary.

At trial, the military judge heard evidence and issued a written ruling denying the motion to suppress. He made the following pertinent factual findings, which—with the exception of several apparent errors as to the dates—are supported by the record:

> . . .
>
> 3. During [A1C JS's] time at AFOSI [on 7 July 2014], [SA B] asked [A1C JS] if she would like to find out more information about what happened to her to get [Appellant's] side of the story. [A1C JS] agreed that she would and [SA B] suggested that she conduct a text conversation with [Appellant] regarding what had happened on 5 July 2015 [sic]. [SA B] suggested general topics and possible questions but [A1C JS] determined which questions to ask [Appellant] and about what topics.
>
> 4. [A1C JS] and [Appellant] engaged in a text conversation . . . .
>
> 5. On 7 July 2015 [sic] while at AFOSI, [A1C JS] was not working as an agent for AFOSI nor was she acting in a law enforcement capacity as a Security Forces troop, she was there rather

as a victim to report a crime. [A1C JS] was given no briefings or training by AFOSI prior to the text exchange.

. . .

7. On 7 July 2015 [sic], [Appellant] was called to AFOSI for an interview relating to the allegations made by [A1C JS]. [Appellant] was transported to AFOSI by his First Sergeant and was not constrained in any way during the transport. When he arrived, [Appellant] was placed in an interview room for a short period of time while AFOSI prepared for the interview.

8. The interview began at 2056 hours with some basic rapport building. [Appellant] was provided with a rights advisement in accordance with Article 31 of the UCMJ at 2108 by [Special Agent (SA) C]. In the time between 2056 and 2108 no questions were asked of [Appellant] likely to solicit [sic] an incriminating response. [Appellant] was notified that [SA C] suspected him of committing the offense of Rape in violation of Article 120 of the UCMJ. At approximately 2109 hours [Appellant] indicated that he understood his rights in accordance with Article 31, that he did not desire to consult with a lawyer, that he wished to waive his rights and talk with the AFOSI. During the course of the rights advisement, there was a pause and [SA C] told [Appellant] that he could start talking with the [AFOSI] and then stop at anytime. [Appellant] responded acknowledging that he could lawyer up at any time.

9. During the rights advisement and subsequent interview [Appellant] was alert and spoke coherently. He asked questions and responded appropriately to the questions asked by [SA C]. During the course of his time at AFOSI [Appellant] was offered various bathroom breaks along with food and water.

10. [Appellant] went on to make oral statements and written statements to AFOSI over the next two and a half hours . . . .

. . .

In analyzing the pretext text message exchange, the military judge recited the four-part test for when an Article 31 rights advisement is required as restated in *Jones*, 73 M.J. at 361. He found A1C JS was not acting in a disciplinary or law enforcement capacity at the time, and, therefore, no Article 31 rights advisement was required. We find no abuse of discretion in this conclusion. The mere fact A1C JS was a security forces member is not determinative

of whether she was acting as an agent of the Government during the text exchange. *See United States v. Buford*, 74 M.J. 98, 101 (C.A.A.F. 2015). A1C JS was present at AFOSI as a crime victim, not in a law enforcement capacity. She had no training or prior experience as an agent or informant for AFOSI. Although SA B suggested that she might want to text Appellant about the incident, and suggested certain topics, he did not direct her to do so, and A1C JS decided what questions to ask. During the motions hearing, A1C JS and SA B both testified that A1C JS declined to ask certain questions suggested by the agent. Moreover, a reasonable person in Appellant's position would not have perceived A1C JS to be acting in a disciplinary or law enforcement capacity at the time. *See Jones*, 73 M.J. at 362. Although Appellant knew A1C JS was in security forces, he knew her as a peer and he outranked her. The nature of the exchange was personal and informal, with A1C JS asking questions about events she could not remember and expressing sadness at what occurred.

When reviewing Appellant's interview with AFOSI, the military judge found the totality of the circumstances indicated Appellant freely and knowingly waived his Article 31 rights, and his statements were voluntary. We agree. Although Appellant paused after SA C read him his rights, apparently deep in thought, he did not request to speak to a lawyer or refuse to answer questions. SA C's clarification that Appellant could stop the interview after it began was an accurate statement and did not constitute coercion, unlawful influence, or unlawful inducement. *See Freeman*, 65 M.J. at 453; Mil. R. Evid. 304(a)(1)(A). We are convinced Appellant made a free and voluntary decision to proceed with the interview.

Finally, Appellant's assertion that AFOSI's misrepresentation regarding the legal standard for capability to consent rendered his statement involuntary is without merit. Well into the interview, the following colloquy occurred between Appellant and SA C:

> SA C: You've been in for what, say five years. And how many sexual assault briefings have you been to in those five years?
>
> Appellant: Wow. I don't know if they are annually? . . . I would say quite a few.
>
> SA C: What's the Air Force's policy on consent or when someone cannot consent?
>
> Appellant: Um, drunk.
>
> SA C: Was she drunk that night?
>
> Appellant: Yes.

SA C: So, could she consent? According to the Air Force policy, and you are both Air Force, could she consent?

Appellant: Legally not.

SA C: Correct. So, did—I'm gonna ask you the question again. Do you think that she could consent to what happened that night?

Appellant: In my opinion, yes. Legally, no. I felt like she was perfectly capable of giving me consent. Making advances towards me. Conscious. She was up. Level-headed. Yes, I feel she could, after all that.

SA C: And legally?

Appellant: Legally, obviously, no. She was drunk. We were both drunk. Anybody that's drunk—it is considered no consent. I mean, there's people who have sex all the time when they are drunk. I mean, it happens. But legally, no. You can't give consent when you are drunk.

SA C: And knowing that . . .

Appellant: Knowing I'm a cop, yeah, I should have made the best judgment call there.

Although SA C adopted Appellant's incorrect statement of law, presumably as an interrogation ploy, a false statement by an investigator is not determinative of the voluntariness of a statement. *See Freeman*, 451 M.J. at 455. We still examine the totality of the circumstances. *Id.* at 453. In this case, considering the Appellant, his demeanor, the demeanor and statements of the investigators, and the circumstances of the interview, we easily conclude Appellant's statements were voluntary and not unlawfully induced or coerced.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court