# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40226**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Alexander V. JONES**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 30 May 2023

————————————

*Military Judge:* Julie L. Pitvorec.

*Sentence:* Sentence adjudged 18 August 2021 by GCM convened at Joint Base McGuire-Dix-Lakehurst, New Jersey. Sentence entered by military judge on 5 November 2021: Dishonorable discharge, confinement for 48 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Jenna M. Arroyo, USAF.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, CADOTTE, and ANNEXSTAD, *Appellate Military Judges*.

Senior Judge RICHARDSON delivered the opinion of the court, in which Judge CADOTTE and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of sexual assault and one specification of wrongful distribution of intimate visual images in violation of Articles 120 and 117a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 917a.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 48 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raises five issues on appeal, asking whether (1) Appellant was deprived of a constitutional right to a unanimous verdict; (2) Appellant's convictions for sexual assault are legally and factually sufficient; (3) Appellant's conviction for wrongful distribution of intimate images is legally and factually sufficient; (4) the military judge erred in failing to excuse a court member for implied bias; and (5) the military judge abused her discretion in denying a defense motion to compel the complaining witness's medical records relating to diagnosis and prescribed medications.[3] We have carefully considered issues (1) and (2) and find they do not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find the convictions to be legally and factually sufficient. We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

Appellant and JJ met around 2017. They married in August 2018, after Appellant completed technical school in Texas and before he moved to Joint Base McGuire-Dix-Lakehurst (JBMDL). JJ did not move to JBMDL until late December 2018. The two were divorced right before trial.

JJ testified at length about the charged offenses. While at technical school in Texas, Appellant asked JJ numerous times to send sexual photos of herself to him. She was hesitant, and told him she was concerned that he would share

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Military Rules of Evidence, and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The members found Appellant not guilty of one specification of domestic violence by strangling, charged in violation of Article 128b, UCMJ, 10 U.S.C. § 928b.

[3] The military judge sealed the documents and transcript pages relating to Appellant's motion to compel because they contained matters involving Mil. R. Evid. 513. While we resolve this assignment of error on a basis other than Mil. R. Evid. 513, our opinion necessarily contains discussion of some of this sealed material.

them. When she finally agreed to send the photos, she told Appellant, "if [she] was going to send those, not to share them." Appellant "promised" he would not share them, and she sent Appellant at least three intimate photos of herself. JJ did not consent to Appellant sending those photos to anyone else.

One day in early 2019, after Appellant was asleep, JJ looked through Appellant's phone. She found recent messages between Appellant and another woman, MK, that included those photos of JJ and sexual comments about those photos. JJ knew MK through Appellant. In the messages, Appellant told MK to keep the photos a secret, which MK took to mean a secret from JJ.

When JJ saw that Appellant sent those photos to MK, JJ was "very upset," "shaking," and "blown away and baffled." She went to a friend's house, still "very upset." JJ's friend advised her to talk to Appellant. JJ went home, woke Appellant, and confronted him. JJ testified, "He claimed that he didn't know what I was talking about; and, then, once he saw the photos, he said it wasn't what it looked like." JJ called and texted MK still feeling "upset." JJ suspected MK and Appellant were having an affair, but MK assured her they were not. After JJ and MK talked, they stayed on friendly terms, although JJ was "disappointed" MK had not told her Appellant sent the photos. Appellant claimed to investigators that JJ wanted to have a "threesome" and he sent the photos to MK to facilitate it.[4] MK denied talking to Appellant or JJ about "a threesome." JJ admitted that one time she talked to Appellant about a threesome, but insisted she did not consent to him distributing the photos.

About a year later, in March 2020, JJ told Appellant she wanted a divorce. Appellant did not. The two continued to live together, but kept separate bedrooms. About a week later, the couple had what JJ called "a reconcile period" that "lasted like two days," during which time they engaged in consensual sexual activity.

JJ also described the events leading to Appellant sexually assaulting her in their home around 28 March 2020. That evening, JJ had gone to a friend's house, where she drank no more than one alcoholic beverage. She arrived home around 0100; Appellant arrived home shortly thereafter. Anticipating a confrontation, JJ turned on the voice-memo feature of her watch. Appellant questioned JJ about what she did that evening and with whom, then took her phone. JJ's watch captured audio of their ensuing argument. Most of the argument is about JJ's phone; Appellant asked JJ to "beg for it." He also said, "Beg for it. Beg. You're already on your knees, go ahead." JJ told him "stop" and "get off of me" numerous times. During part of the recorded exchange, Appellant

---

[4] Investigators interviewed Appellant about the photos in the course of their investigation into the events on 28 March 2020, as described below.

pulled JJ's hair and put his fingers in her mouth, all while JJ was telling him to stop.

JJ also testified Appellant "slamm[ed] her face into the couch" and she "kept trying to get away from him." Appellant then picked up JJ and took her to the bedroom, where he removed her leggings. He put his fingers in JJ's vagina while JJ told Appellant multiple times to stop. Appellant began to lick JJ's vaginal area. Appellant maneuvered JJ to a different position on the bed and "pinned [her] to where [she] couldn't move."

During direct examination, JJ explained what happened next:

> [JJ]. He basically decided to have his way with me.
>
> [Circuit Trial Counsel (CTC)]. What do you mean, he had his way with you?
>
> [JJ]. He proceeded to have sex with me, even though I was asking him not to.
>
> [CTC]. When you say this, it matters exactly what sex you're referring to. What did he do?
>
> [JJ]. He put his penis inside of my vagina.
>
> [CTC]. Were you telling him to stop?
>
> [JJ]. I . . . yeah. I asked him to stop. I begged for him to stop. At one point, I was even crying and he told me that nobody would feel sorry for me.
>
> [CTC]. Did he stop?
>
> [JJ]. No.

JJ recorded other conversations with Appellant that night. JJ asked Appellant to leave her alone, to which Appellant replied that he was "being super civil about all this." JJ disagreed, telling Appellant, "You just f**king basically raped me." Appellant denied he had, and stated, "No, I did not. I did not rape you. If I raped you -- if I would have raped you, I would still go, but I'm not that type of person." JJ told Appellant to "go to [his] room and close the door," and Appellant complied.

About 15 minutes later, JJ heard Appellant talking and laughing. She confronted Appellant, then called 9-1-1 and locked herself in her bedroom. JJ told the 9-1-1 operator Appellant "forced himself" on her, as well as "choked" her and "slammed" her into a wall. She denied having any injuries. During this time, Appellant removed the knob from the bedroom door. When security forces personnel responded, Appellant was sitting in the front yard.

After he was apprehended, Appellant agreed to be interviewed by Air Force Office of Special Investigations (AFOSI) agents. Appellant admitted digital and penile penetration of JJ's vulva, and oral contact on her vaginal area. He denied ever physically assaulting JJ. AFOSI agents gathered Appellant's clothes and took a DNA sample.

Later that morning, JJ went to a local hospital where a nurse performed a sexual assault forensic examination. The nurse noted JJ "was quiet and crying" and complained of lower abdominal and lower back pain. The nurse saw no injuries, which she testified was "common" after a report of sexual assault. Forensic testing revealed Appellant's DNA in JJ's vagina, and JJ's DNA on Appellant's underwear.

JJ admitted having "angry sex" with Appellant in the past. She described it as "a little bit more of an aggressive style of sex" but distinguished it from what occurred on the night of the charged sexual assault. She clarified that "angry sex" is consensual, does not involve repeatedly saying no and the other person not stopping, and does not result in a 9-1-1 call or trip to the hospital.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). In resolving questions of legal sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Bright*, 66 M.J. 359, 365 (C.A.A.F. 2008) (internal quotation marks and citations omitted). The evidence supporting a conviction can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing Rule for Courts-Martial (R.C.M.) 918(c)) (additional citation omitted). "[A] rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *Id.* at 369 (quoting *Holland v. United*

*States*, 348 U.S. 121, 140 (1954)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (internal quotation marks and citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

**2. Analysis**

The parties agree that, as charged in this case, the offense of wrongful distribution of intimate images in violation of Article 117a, UCMJ, has seven elements:

> (1) on or about 24 January 2019, at or near Joint Base McGuire-Dix-Lakehurst, New Jersey, [Appellant] knowingly and wrongfully distributed intimate visual images of JJ;
>
> (2) JJ was at least 18 years of age when the visual images were created;
>
> (3) JJ is identifiable from the visual images or from information displayed in connection with the visual images;
>
> (4) JJ did not explicitly consent to the distribution of the visual images;
>
> (5) [Appellant] knew, or reasonably should have known, that the visual images were made under circumstances in which JJ retained a reasonable expectation of privacy regarding any distribution of the visual images;
>
> (6) [Appellant] knew, or reasonably should have known, that the distribution of the visual images was likely to cause emotional distress for JJ; and,
>
> (7) [Appellant's] conduct, under the circumstances, had a reasonably direct and palpable connection to a military mission or military environment.

*See also* Article 117a, UCMJ, *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), App. 2 at A2-40.

Appellant challenges the legal and factual sufficiency of his conviction for wrongful distribution of intimate visual images, asserting the Government failed to prove beyond a reasonable doubt elements (6) and (7). Appellant does not challenge the Government's proof for the other elements of the offense.

### a. *Likely to Cause Emotional Distress*

Appellant acknowledges JJ was upset after learning he had shared the intimate images of her with MK, but argues the evidence is not clear exactly what JJ was upset about. Further, he suggests that feeling "very upset" does not qualify as "emotional distress." Appellant also asserts a lack of evidence that Appellant "sent these pictures to cause [JJ] emotional distress."

This court finds a rational factfinder could conclude from the evidence that Appellant either knew or reasonably should have known JJ would likely suffer emotional distress if he broke his promise and shared the photos with another woman. The evidence shows Appellant pressured JJ to send him the photos in the first instance, and JJ refused until she was satisfied Appellant was not going to share them with anyone else. JJ testified she was "very upset," "shaking," and "blown away and baffled" upon discovering Appellant distributed the images against her wishes. Whether or not Appellant believed JJ was interested in the general idea of a threesome with the recipient of the photos is beside the point. Moreover, the Government was not required to prove JJ actually was caused emotional distress or Appellant intended to cause her emotional distress.

### b. *Connection to Military*

Appellant argues his conduct did not have a connection to the military mission or military environment. He notes that at trial, the Government presented no argument that Appellant's conduct had a connection to a military *mission*, and the evidence did not support any such connection. Appellant contends that "[t]o allow the Government to prove 'a reasonably direct and palpable connection to a . . . military environment,' merely because [Appellant] was a military member, [MK] was a military member, and [JJ] was the spouse of a military member [ ], makes this element surplusage." We are not persuaded.

Appellant shared the intimate photos of JJ with MK, a person whom he knew was a military member. The evidence indicates one of Appellant's purposes for sharing the photos was to facilitate a sexual liaison with his wife and this other military member. Appellant's conduct was sufficiently connected to a military environment because he put MK—a military member—"in contact with the images" by sending them directly to her. *United States v. Hiser*, 82 M.J. 60, 66–67 (C.A.A.F. 2022) (finding a connection to a military environment

where an appellant posted intimate photos to a pornography website and a military member saw them). We conclude a rational factfinder could find that, under the circumstances of this case, Appellant sending the intimate photos of his wife to MK "had a reasonably direct and palpable connection to a . . . military environment." Article 117a, UCMJ, *MCM*, App. 2 at A2-40.

We conclude that viewing the evidence produced at trial in the light most favorable to the Prosecution demonstrates a rational trier of fact could have found the essential elements of wrongful distribution of intimate images beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Rodela*, 82 M.J. at 525.

## B. Challenge for Implied Bias

Appellant asserts the military judge erred in denying the defense challenge against Lt Col EW for implied bias when the member: (1) had a family commitment the next day; (2) expressed "'strong feelings' concerning cheating and threesomes;" and (3) believed not-guilty findings in sexual assault cases place the military in a negative light. Appellant also asserts the military judge failed to articulate the standard for implied bias. We find the military judge did not err.

### 1. Additional Background

In group voir dire, the military judge asked, "[D]oes anyone know of anything of a personal or professional nature that would cause you to be unable to give your full attention to these proceedings throughout the trial?" Lt Col EW answered in the affirmative. He explained he had tickets to a baseball game the next day at 1600 that "a large quantity of [his] family [was] coming into town to go to in Philadelphia[.]" In individual voir dire, the military judge asked Lt Col EW follow-up questions. She asked him what time he would have to leave to make the game, and he replied, "I believe I could probably make 2 o'clock work. I mean, my wife wouldn't be super happy to take the five kids down that direction herself, but she'd be going with family being there to help her going to the hotel . . . ." Lt Col EW explained his plan was not to stay at the hotel the evening of the game, but return to his home on base. When asked about his plans for the following day—Sunday—he mentioned a tentative plan in Philadelphia "that can be worked around," and said, "Again, just to emphasize," because he was "wearing the uniform, [he would] do what [he was] told to do." He explained that the other family members were on his wife's side, he had seen them recently, and none was planning to stay at or visit his home.

In group voir dire, trial defense counsel asked, "Does anyone have any strong feelings about cheating in a marriage that may impact your ability to

be fair in deciding this case?" After receiving a negative response from everyone but Lt Col JJ—who hesitated—defense counsel asked if he would like to "talk about this one-on-one," to which he agreed. Lt Col EW then said he would like that as well. Soon thereafter, trial defense counsel asked whether any member has "any moral, ethical, or religious feelings about consensual threesomes that may impact [their] ability to be fair in deciding this case?" Lt Col JJ and Lt Col EW provided responses similar to the cheating question.

During individual voir dire, Lt Col EW explained that he believed "marriage between a man and a woman is sacred, and cheating can vastly impact that relationship in a negative way." He also stated "a consensual threesome" was a form of cheating, considering "the marriage vows." After Lt Col EW was asked to confirm that he had "strong feelings" on these topics, he stated:

> I feel as we put -- as we all put these uniforms on, we all have personal feelings that I am -- have to put aside to be able to lead in good order and discipline. Just because I have a differing opinion on how things are doesn't mean I can't be objective to the whole of the process. I do realize that not everyone shares the same values with me on that.

Lt Col EW affirmed that hearing about cheating or a threesome during trial would not cause him "to make any kind of judgments about the other facts in the case."

The circuit trial counsel and then the military judge followed up with Lt Col EW about his response in group voir dire that a finding of not guilty for a sexual or physical assault charge would reflect negatively on the military.

> [Lt Col EW]. . . . I think the civilian side of the United States fails to take that into account sometimes and expects us to -- that if it happens, we should -- it should never happen in the military and, therefore, if it does, it should be an automatic guilty. I think that's a negative light that's put on the military.
>
> I don't feel it takes away from the proceedings here. I think everything internal is fine. But exterior, I think there's negative light to whenever a negative sexual assault -- a not guilty verdict is given in a sexual assault.
>
> . . . .
>
> [Circuit Trial Counsel]. . . . Do you think it should be an automatic guilty because there's an allegation?
>
> [Lt Col EW]. Oh, no, not at all.
>
> . . . .

[Military Judge (MJ)]. [Lt Col EW], before he stops. Are you referring -- when you say "public perception," are you referring to just the sheer number of congressional hearings and all the stuff that's been happening?

[Lt Col EW]. Yes, ma'am.

[MJ]. Okay. So when you say the "public perception," you're talking about the external -- like the external pressure from Congress to, you know, crack down on sexual assaults?

[Lt Col EW]. Yes, ma'am.

[MJ]. Okay. Does that external pressure from Congress influence you in any way to vote for a finding of guilty without any evidence in this case?

[Lt Col EW]. None whatsoever.

[MJ]. Would you keep an open mind and follow my instructions to hold the Government to the standard of proof beyond a reasonable doubt?

[Lt Col EW]. Yes, ma'am.

The Defense challenged Lt Col EW for cause for implied bias and for the same reasons as articulated on appeal. In denying the challenge, the military judge stated:

> So I have considered the challenge -- the defense challenge for cause under both actual and implied bias theories, and I am aware of the duty to liberally grant defense challenges. However, [Lt Col EW] was very clear in his ability. I think he even said, "I wear the uniform. I will be wherever you tell me to be." He was questioned -- he was questioned ad nauseam about his positions.
>
> He actually clarified, to the Court's questions, about what he meant by when he said the negative reflection is that it was a congressional mandate and that Congress is constantly looking.
>
> He also stated . . . that he would weigh this case on the facts of the case alone and was, I think, very candid about his feelings. . . .

The Defense then challenged Lt Col JJ for cause, also based on implied bias. When denying that challenge, the military judge stated, "In fact, to be perfectly honest, I don't think it's even close *for either one of them*." (Emphasis added). The Defense used its peremptory challenge against Lt Col JJ.

**2. Law**

"A member shall be excused for cause whenever it appears that the member . . . [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." R.C.M. 912(f)(1)(N). "'Substantial doubt' exists where the presence of a member on the panel would cause the public to think 'that the accused received something less than a court of fair, impartial members,' injuring the public's perception of the fairness of the military justice system." *United States v. Commisso*, 76 M.J. 315, 323 (C.A.A.F. 2017) (citation omitted). Implied bias is measured by an objective standard. *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (citation omitted). "Implied bias exists when, 'regardless of an individual member's disclaimer of bias, most people in the same position would be prejudiced. . . .'" *Id.* (citation omitted). We assess implied bias based on the "totality of the factual circumstances," assuming the "hypothetical 'public'" is familiar with the military justice system. *Id.* (citations omitted).

"The military judge is [ ] mandated to err on the side of granting a challenge[; t]his is what is meant by the liberal grant mandate." *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015) (citation omitted).

We review the military judge's ruling on a claim of implied bias "pursuant to a standard that is 'less deferential than abuse of discretion, but more deferential than de novo review.'" *United States v. Dockery*, 76 M.J. 91, 96 (C.A.A.F. 2017) (quoting *Peters*, 74 M.J. at 33). This standard is appropriate "in light of the fact that resolving claims of implied bias involves questions of fact and demeanor, not just law." *United States v. Woods*, 74 M.J. 238, 243 n.1 (C.A.A.F. 2015). Appellate courts afford greater deference to a military judge's ruling on a challenge for implied bias where the military judge puts her analysis on the record and provides a "clear signal" she applied the correct law. *United States v. Rogers*, 75 M.J. 270, 273 (C.A.A.F. 2016) (citations omitted). "In cases where less deference is accorded, the analysis logically moves more towards a de novo standard of review." *Id.* "[I]n the absence of actual bias, where a military judge considers a challenge based on implied bias, recognizes his duty to liberally grant defense challenges, and places his reasoning on the record, instances in which the military judge's exercise of discretion will be reversed will indeed be rare." *United States v. Clay*, 64 M.J. 274, 277 (C.A.A.F. 2007).

**3. Analysis**

In assessing the challenge against Lt Col EW, the military judge invoked implied bias and the liberal grant mandate, as well as actual bias. Although the military judge did not state the standard for considering a challenge based on implied bias, we see no reason to conclude she did not apply the correct standard. To the contrary, she provided a "clear signal" that she understood

the law when granting a challenge for cause against another member based on implied bias. *See Rogers*, 75 M.J. at 273. Regarding that challenge, the military judge stated, "I do believe that if the public were watching this and knew that the spouse of a sex assault victim were on this court-martial that it would cause them to question our military justice system."

The military judge did not find the challenge against Lt Col EW a "close call." She stated Lt Col EW "was very clear in his ability" to yield to duties required by his "wear[ing of] the uniform." She found that Lt Col EW believed it was Congress that would see a not-guilty verdict as a negative reflection of the military. She further found that Lt Col EW was "very candid" and was "questioned ad nauseum," and his personal feelings about cheating and three-somes would not factor into his determination of the facts of the case.

If we were to give the military judge less deference because her stated reasoning was thin, we still would find no error. From our review, it appears Lt Col EW was not very concerned with missing the family event. Moreover, by asking what time he would need to leave to get ready for the game, the military judge gave him reason to believe that he could be released in time to make the event.[5] Regarding "cheating" and "threesomes," Lt Col EW gave no indication his personal feelings would cloud his consideration of the evidence in Appellant's case. We do not find Lt Col EW's continued presence as a court member to be injurious to "the public's perception of the fairness of the military justice system." *See Commisso*, 76 M.J. at 323. Finding no error, we grant no relief.

## C. Diagnosis and Prescription Records

Appellant contends the military judge erred in denying his motion to compel discovery for medical records relating to JJ's mental health diagnosis and related medical prescriptions. Appellant notes the military judge denied the Defense's motion after analyzing three rules: R.C.M. 701, 703, and Mil. R. Evid. 513. We find the military judge did not abuse her discretion in denying the motion based on R.C.M. 701 and 703; consequently, we need not reach the issue involving Mil. R. Evid. 513.

### 1. Law

"We review a military judge's ruling on requests for discovery or production of evidence for an abuse of discretion." *United States v. Bishop*, 76 M.J. 627, 633 (A.F. Ct. Crim. App. 2017) (citations omitted); *see also United States v. Graner*, 69 M.J. 104, 107 (C.A.A.F. 2010) (noting this is a "strict standard"). We find an abuse of discretion when the military judge's "findings of fact are

---

[5] We note that the court-martial was not in session on that Saturday, a circumstance the military judge may have predicted.

clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2009) (citation omitted).

Discovery of evidence in the possession of the Government is regulated by R.C.M. 701; production of evidence is regulated by R.C.M. 703. "Each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(e)(1).

> [A]ny defense request for the production of evidence shall list the items of evidence to be produced and shall include a description of each item sufficient to show its relevance and necessity, a statement where it can be obtained, and, if known, the name, address, and telephone number of the custodian of the evidence.

R.C.M. 703(f). Evidence "not under control of the Government may be obtained by subpoena." R.C.M. 703(g)(3)(A). The Defense bears the burden of showing that the requested evidence exists. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004).

### 2. Additional Background

Prior to trial, the Defense requested the Government provide a "Record of JJ's [disorder] diagnosis and medication history for treating it from August 2018 until 30 March 2020." The Defense provided no additional information related to this request. The Defense did not indicate whether the Government or some other entity held the records. The Government denied this defense request based on Mil. R. Evid. 513 and relevance.

The Defense then filed a motion with the military judge "to compel the Government to fully discover and disclose records of JJ's [disorder] diagnosis and medication history for treating said diagnosis from August 2018 until the present." The Defense supported its request with excerpts from the AFOSI investigative file, showing JJ told AFOSI agents that she was diagnosed with a certain disorder and was prescribed medications to treat it in January 2020, and that the medication lowered her sex drive and induced heavy sleep. The Defense argued that evidence of the date JJ was diagnosed and prescribed medications was relevant to "whether or not [JJ] could perceive, comprehend, and/or remember what happened in January 2019 and March 2020," the timeframe of the charged offenses. The Defense supported its assertion with a memorandum from an expert psychologist, which explained the symptoms of the disorder and generally how a professional would diagnose and treat it. However, the Defense did not claim JJ suffered any particular symptoms or episodes at any particular time. The Defense also argued JJ's diagnosis and medication history were relevant to Appellant's purpose for removing locked doorknobs,

specifically that they could show his concern for her safety. The Defense emphasized that their request was limited to diagnosis and medication records—and not communications—and thus was not protected by the privilege in Mil. R. Evid. 513. During argument on the motion in a closed hearing pursuant to Mil. R. Evid. 513 and Article 39(a), UCMJ, 10 U.S.C. § 839(a), the Defense added that whether JJ actually had that diagnosis as she claimed was relevant to her truthfulness.[6]

The military judge denied the Defense's motion to compel discovery based on, *inter alia*, R.C.M. 701 and 703. In her written ruling, the military judge found the Defense had not established that the Government was in possession of the requested documents, and therefore had no duty to provide them to the Defense under R.C.M. 701. The military judge also ruled:

> The [D]efense has failed to meet the requirements under [R.C.M.] 703(f): the [D]efense does not include a description of each item sufficient to show its relevance and necessity, a statement where it can be obtained, or, if known, the name, address, and telephone number of the custodian of the evidence as required by [R.C.M.] 703(f). Additionally, the [D]efense must show the evidence requested is relevant and necessary, and not cumulative, which [defense counsel] has failed to do.

The military judge determined that while "JJ's credibility will be in issue, it is not clear that whether she had medications or received treatment is in dispute or 'in issue.'" The military judge also determined it "is not clear that further evidence regarding the timing of prescriptions or treatment makes any fact in issue more or less likely." She highlighted that the Defense already had "evidence indicating JJ had a history of [the] disorder and had access to medication close in time to the alleged sexual assault when [JJ's] statements were made." Moreover, the military judge noted that "prescriptions alone [do] not indicate consumption, effectiveness, or reasons for such medication" and even if they did, "it is not clear how such information would make JJ's statement more or less likely to be true." The military judge found that "[w]hile individuals who are in an active [ ] episode may have difficulty accurately perceiving their surroundings, the same is not expected" when the individual is at "baseline." She further found "no evidence to suggest JJ was in an active [ ] episode on 28 March 2020."

---

[6] Before a military judge may order production of matters covered by Mil. R. Evid. 513, she "must conduct a hearing, which shall be closed" and "outside the presence of the members." Mil. R. Evid. 513(e)(2).

In its case in chief, the Government offered Prosecution Exhibit 4, a video recording of an AFOSI interview with Appellant. The Defense objected to the Government's proposed redactions. Specifically, the Defense noted that the Government redacted only part of the "discussions about [JJ's] [ ] diagnosis." Citing Mil. R. Evid. 403, the Defense requested that if the Government redacted some, it should redact it all. The Government agreed to redact that additional portion of the video recording, resulting in no mention of JJ's diagnosis.

The Defense, however, introduced evidence of JJ's mental health diagnosis and prescriptions through cross-examination of the sexual assault nurse examiner (SANE) and a page from the SANE report—Defense Exhibit A. Both indicated JJ said her "current medications" included a medication used to treat the disorder, and "medical history" consisted of a shorthand name for the disorder. During cross-examination of JJ, the Defense did not ask her about her diagnosis or related medication history. In closing argument, the Defense questioned why the Government did not present evidence of JJ's medical history:

> What about the SANE report? Why is this important? [Appellant] talks about [JJ] mixing her meds with alcohol and why he took the door knobs off, his motivation behind this. So, knowing from [Defense] Exhibit A that [JJ] was diagnosed with [the disorder] and is on current medication is -- I mean, would you want to know that? Would that be important to assessing her credibility, her state of mind at that time, maybe even [Appellant's] motivation?

### 3. Analysis

Appellant does not directly contest the parts of the military judge's ruling under R.C.M. 701 and 703 that the Government did not have possession of the requested records and that the Defense failed to provide a statement or information about how the requested records can be obtained. Instead, he asserts the military judge's "belief that the records were protected by [Mil. R. Evid.] 513 colored her entire analysis," including of R.C.M. 701 and 703. His support for this assertion is that "the majority of the military judge's questions" during the closed Article 39(a), UCMJ, hearing were about the application of Mil. R. Evid. 513. Essentially, Appellant faults the Government for not issuing a subpoena for records the Defense did not identify with any specificity. Similarly, Appellant faults the military judge for not compelling the Government to produce records not known to be under the Government's control and for not reviewing any purported records *in camera*.

We find the military judge did not abuse her discretion in determining the Defense failed to meet the requirement of R.C.M. 703 for records not under the

control of the Government. The Defense did not provide information that the Government would need to prepare and issue a subpoena, nor did the Defense request investigative assistance to gather this information. Relatedly, the Defense failed in its burden to show that the records exist. On these grounds alone we find the military judge did not abuse her discretion in denying the defense motion.

We also find the military judge did not abuse her discretion in determining the Defense failed to meet the requirement under R.C.M. 703 to demonstrate both the relevance and necessity of the purported records. The Defense sought information about the diagnosis to show JJ acted in conformity with the disorder, or—changing tack—that she lied about the diagnosis. The former could be considered improper character evidence.[7] Regardless, the military judge reasonably found that evidence a victim with the disorder was in an "active episode" as opposed to at "baseline" would be relevant, but no evidence suggested JJ was suffering an active episode on 28 March 2020. Regarding the latter contention, the military judge reasonably determined that the Defense failed to establish that the absence of a diagnosis in a record was both relevant and necessary.[8]

The military judge found as fact that Appellant told AFOSI agents that JJ was diagnosed with the disorder and that he was concerned about her suicidal ideations, leading him to remove a door knob. She also found as fact that JJ admitted to AFOSI agents that she had the diagnosis and was taking medications to treat it. The military judge concluded that "while [D]efense makes the discovery request, it is clear [D]efense already has the facts it seeks to obtain through discovery." Indeed, the relevance is Appellant's belief of JJ's assertions about whether JJ was diagnosed with a mental health disorder which might lead to suicidal ideations, not whether such a diagnosis was actually made.

---

[7] "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Mil. R. Evid. 404(a)(1). "Character evidence" might include "psychiatric diagnosis or personality disorders." *United States v. Dimberio*, 56 M.J. 20, 25 (C.A.A.F. 2001). An exception to this prohibition against introducing character evidence is that an accused may offer evidence of "an alleged victim's pertinent trait." Mil. R. Evid. 404(a)(2)(B). Moreover, even if inadmissible under Mil. R. Evid. 404(a), an accused may have a constitutional right to introduce evidence of a psychological diagnosis if legally and logically relevant under Mil. R. Evid. 401 and 403. *Dimberio*, 56 M.J. at 25. Whether a victim's ability to perceive and remember, mental capacity, or psychological condition are "pertinent traits" within the meaning of Mil. R. Evid. 404(a) is an open question that we do not resolve today.

[8] Without being able to identify any holder of a responsive medical record, the Defense could have little hope of finding the absence of a diagnosis.

Additionally, the Defense wanted records of JJ's prescriptions to show JJ took medication to treat her condition and was under the influence of that medication during the charged timeframes. The Defense supported its contentions about the characteristics of the disorder generally, but was unable to show that a record containing only a diagnosis or prescription history would reveal whether JJ was suffering an episode at any relevant time. Furthermore, the records would do little to show JJ ingested medication at any relevant time.

Finally, we reject Appellant's contention that the military judge's analysis of R.C.M. 701 and 703 was flawed because of an erroneous view of Mil. R. Evid. 513. The hearing on the Defense's motion to compel was closed because it potentially would disclose matters protected by Mil. R. Evid. 513. This would explain why most of the military judge's questions were about that Rule. The military judge's rulings on R.C.M. 701 and 703 were almost entirely independent from her ruling on Mil. R. Evid. 513. The military judge alluded to Mil. R. Evid. 513 only in her consideration of whether the requested evidence was cumulative, noting the "[D]efense has other avenues, vice *piercing a protected privilege* to obtain such evidence, to include others JJ may have disclosed to, as well as inquiries of JJ that would bear on her credibility." (Emphasis added). The military judge carefully considered the Defense's arguments, proffers, and evidence; applied R.C.M. 703; and reasonably determined the information the Defense anticipated it would find in a record would not be relevant and necessary.

We find the military judge did not abuse her discretion in denying the defense motion to compel JJ's medical records based on R.C.M. 701 and 703. In this regard, the military judge's findings of fact were not clearly erroneous, her determinations were not influenced by an erroneous view of the law, and her decision was inside the range of choices reasonably arising from the applicable facts and the law. *See Miller*, 66 M.J. at 307.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

17